# Richmond.

## METROPOLITAN LIFE INSURANCE CO. v. DEVAULT'S ADMINISTRATRIX.

### March 11, 1909.

### Absent, Keith, P.

1. APPEAL AND ERROR—*Verdict Sustained by Evidence—Life Insurance—False Representations—Suicide.*—Whether, in the case at bar, the representations made by the assured in his applications for the policy in suit were material and false, and whether the assured came to his death by suicide were questions of fact for the determination of the jury, who were properly instructed upon the law of the case. The burden of proof on these questions was on the defendant company and as the evidence fully sustains the verdict of the jury in favor of the plaintiff on both questions it cannot be set aside on a writ of error.

2. LIFE INSURANCE—*Evidence Required to Prove Suicide.*—The defense of suicide to an action on a life insurance policy, in order to avail, must be established by evidence which excludes every hypothesis of accidental death. The burden of proof on that issue is on the defendant company.

Error to a judgment of the Corporation Court of the city of Fredericksburg in an action of *assumpsit*. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*B. Rand. Wellford* and *A. T. Embrey,* for the plaintiff in error.

*B. P. Willis* and *St. George R. Fitzhugh,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The policy of insurance sued on by defendant in error as administratrix of her deceased son, Edgar E. DeVault, was issued by plaintiff in error December 15, 1906, loss, if any, payable to the estate of the insured; and the insured, Edgar E. DeVault, came to his death by drowning April 26, 1907.

After the death of the deceased, defendant in error furnished, upon blanks provided by plaintiff in error, proof of the death, and under date of June 3, 1907, received a letter from the secretary of the insurer informing her that the claim under the policy had been approved for payment, and check of same date gone forward to the superintendent of the company, whose office was in Richmond, Virginia, who, upon presentation of the letter would turn over to defendant in error the check and take receipt and release on account of the policy, but to this letter was appended notice, that if error was discovered prior to the receipt for the check, the company would have the right to direct its representative to withhold the payment until the error was rectified; and, later, upon request of the company, defendant in error through Mr. Hanway, assistant superintendent of the company for Lee district, Virginia, at Fredericksburg, furnished authenticated copies of the coroner's verdict over the body of the deceased, and of loss, as required by the policy; whereupon, the company tendered to defendant in error by check the amount of the first premium paid on the policy, in full settlement thereof, declining to pay the face value of the policy on the ground that the policy had lapsed by reason of the death of the insured by suicide, which tender defendant in error refused, and thereupon instituted this action on the policy.

What there may have been in the report of the inquest, if anything, which caused plaintiff in error to change its position with reference to its liability on the policy, does not appear in the record.

At the trial, plaintiff in error made defense—first, breach of

the warranties contained in the policy and in the application therefor; and, second, breach of the condition of the policy which provides: "If the insured, within two years from the issue hereof, die by his own hand or act, whether sane or insane, the company shall not be liable for a greater sum than the premiums which have been received on this policy."

The verdict of the jury was in favor of defendant in error for the amount of the policy, which verdict the court refused to set aside on the motion of plaintiff in error, and entered judgment thereon. We are asked to review that judgment, set the same aside and award a new trial to plaintiff in error, upon the ground, solely, that the verdict of the jury is contrary to the evidence, or without sufficient evidence to sustain it.

The rule governing in such a case is so repeatedly and plainly stated in the numerous cases adjudicated by this court, interpreting the statute—sec. 3484 of the Code—as to render its repetition here needless.

Whether the representations made in the application for the policy by the assured were material and false, and whether the assured came to his death by suicide, were questions of fact for determination by the jury, and it is not claimed that the jury were misdirected as to the law upon the facts which the evidence tended to prove. Conceding that the representations were material, were they false? was the question submitted to the jury.

For several years prior to his death, the insured had been a resident of the city of Fredericksburg, where he attended school and afterwards engaged in business as a life insurance agent. In the fall of 1906, he was employed as one of the local agents of plaintiff in error, first under an assistant superintendent named Ferguson, who removed from Fredericksburg about December 1, 1906, and subsequently under one, Thomas H. Hanway, with whom he continued until March, 1907, when he was asked to resign his position, which he did.

December 7, 1906, soon after the arrival of Assistant Super-

intendent Hanway in Fredericksburg, deceased made application to him for a policy of $1,000 on his life. Hanway considering the applicant a good risk took the application and submitted it with the physician's examination to the home office, and in the usual course the policy was issued, bearing date December 15, 1906.

The false answers of the insured relied on to invalidate the policy were answers to the questions as to the applicant's use of intoxicating liquors at the time the application was made and prior thereto, which were as follows:

"15. To what daily or other extent do you use alcoholic stimulants? Ans. None. Wine or malt liquors? Ans. None.

"16. Have you ever used opium or other narcotics, or ever used alcoholic stimulants, wine or malt liquors or tobacco to any excess? If so, when and how long? Give particulars. Ans. No."

Observing that there is no pretense that the insured, at the time of or prior to his application for the policy used daily alcoholic stimulants, wine or malt liquors, or ever used opium or other narcotics or tobacco, we shall direct our attention to the evidence as to whether or not he ever used "alcoholic stimulants, wine or malt liquors to any excess," and "if so, when and how long."

The evidence for plaintiff in error (defendant below) is as follows:

S. W. Somerville, a teacher at Fredericksburg College, resident of Fredericksburg, says that he knew plaintiff and deceased since their residence in Fredericksburg, about four years; first he ever heard of deceased drinking was in January or February, 1907, and he went to him and remonstrated with him, telling him how it would pain his mother, and deceased promised he would not drink again; that deceased stated that "he had taken drinks in China and drinking there is not looked upon as it is here."

G. W. Bahlke, plaintiff in error's superintendent for Lee

district, says that he knew nothing of the habits of deceased, and merely outlines the method of procedure by which a policy in the company is procured, what had been done in this case, and the refusal of the company to pay the policy. He says, however, that a policy would not necessarily be declined issue if the applicant said that he drank intoxicating liquor, but investigation would be made to determine the extent of the drinking; that if applicant was young with habits and character not formed, and was given to intoxication or drank to excess, the policy would not issue; that if applicant was older and habitually intemperate, policy would not issue; that if applicant occasionally used alcoholic stimulants and was not a drunkard, policy would probably issue; that if applicant was young and did not drink to excess, policy would probably issue; that the mere fact that a person got on a spree once in three months would not necessarily keep a policy from issuing.

The difference in the materiality of the answer of a young man to the question, "whether he used alcoholic stimulants to excess," and an answer by an older applicant to the same question, is but an expression of the witness' opinion, as there is nothing in this record to show that plaintiff in error had any such rule, which it had published for the information of persons applying to it for insurance. In fact, according to this witness, the insurer makes no such discrimination, and attaches no importance to the use of alcoholic stimulants, unless used *to excess.* He says, if policy is issued no increased charge of premium is made on account of the use of alcoholic stimulants, and that if the company issued policy at all, the premium was the same, whether applicant was a total abstainer or an occasional drinker.

Hawkins, another witness for plaintiff in error, a real estate agent with office in the rear of the room of plaintiff in error, had lived in Fredericksburg about a year and had known deceased from September, 1906. He says that in the fall of 1906 he thought deceased was of age, and had taken with him

several drinks of whiskey, probably six, before finding out he was a minor, and then would drink with him no more; that he knew deceased drank whiskey, had smelled it on his breath quite frequently in the insurance office; that in October, 1906, deceased had spent the night in Richmond, and on his return to Fredericksburg came to the office and his face and manner showed he had been dissipating in Richmond; that deceased told witness that he had been on a spree in Richmond, and was going home to lie down, "but deceased was not drunk then;" that witness advised deceased to go across the street to the Exchange Hotel and get some sleep; that it was then morning; that deceased took witness' advice and went to the Exchange Hotel; that thereafter witness smelled liquor on deceased's breath, but never saw him under the influence of liquor prior to December 24, 1906. Of this witness we shall have more to say when we come to consider the question, whether or not the deceased came to his death by suicide.

Dr. Scott, plaintiff in error's medical examiner in Fredericksburg, merely identifies the signature of deceased to the medical examination as the basis for the insurance policy, and states that witness performed the examination, etc., which is not disputed, but witness says that he knew nothing of deceased's habits.

Sam Jones (colored), says that for a year or more he had been a porter at the Exchange Hotel, in Fredericksburg, right across from the office of plaintiff in error; that he knew deceased and had known him in the summer of 1906; that in the summer of 1906 witness was with W. A. Bell & Co.'s driver on a furniture van, and passed the City Park in Fredericksburg; that witness saw deceased drunk in the park and on his hands and knees; that witness had Mr. Bell's boy stop the van and let him get out, and that witness went to deceased and helped him up, and deceased told witness he could get along all right; that in the fall of 1906, and before September 26, deceased came to the Exchange Hotel one morning "pretty

drunk" and asked of a clerk, now dead, a room, and upon the clerk collecting 50 cents from deceased witness helped him up-stairs, to get off his overcoat and shoes, and left deceased with instructions to call him at 4 o'clock in the afternoon, which witness did; that a short time thereafter, on the night of the fair german, during the agricultural fair at Fredericksburg, witness was shining shoes of a Mr. Hall near the lavatory in the hotel, and deceased passed witness "pretty drunk" and brushed against witness, causing witness to spill polish on the breeches and socks of Mr. Hall, though witness could not re-member the day or the month.

The next witness for plaintiff in error was Hanway, its as-sistant superintendent for Lee district, Virginia, who after stating his relations with plaintiff in error, his age to be 44 years and married, etc., says he took occasional drink when he needed it, but did not make a practice of drinking; that he solicited the policy sued on, knew nothing of deceased until in November, 1906; knew nothing of deceased's "habits or prac-tices," until after policy sued on was issued; that in the winter of 1906, or in January, 1907, knew that deceased was drink-ing; that deceased would come in the office smelling of whiskey and partially intoxicated, and witness had several fatherly talks with deceased and urged him to give up the habit; that deceased stated that he used to drink in China, and witness told deceased that if he did not stop drinking he would have to resign as agent of the company, but deceased did not give up drinking, and finally, in March (1907) witness told deceased that on ac-count of his drinking he would have to quit the company, and witness recognized acknowledgment of deceased's resignation, which had been already put in evidence; but witness says that December 24, 1906, was the first time he saw deceased under the influence of whiskey, and saw him under the influence of whiskey only twice after that.

The remaining witness for plaintiff in error, C. O'Connor Goolrick, attorney at law, practicing in Fredericksburg, testi-

fied that he knew deceased; that witness helped lead the fair german in 1906; that the german was the night of the second day of the fair, September 26, 1906; that about 9 o'clock that evening witness was at the Exchange Hotel to get his shoes shined, and while Sam Jones was shining them witness saw deceased come into the hotel, and deceased appeared to be a little drinking, but was not drunk.

Defendant in error (plaintiff below), testifying in her own behalf, after introducing the policy of insurance sued on, held by her decedent, and the receipt of plaintiff in error for the premium thereon, paid December 15, 1906, glued to the policy, and countersigned by Hanway, assistant superintendent, on the 31st day of December, 1906, testified that she had been twice married, and was then a widow; that her first husband, Dr. Elijah E. DeVault, father of the deceased, and her second husband, Rev. J. E. Bear, both died when missionaries in China; that deceased was born at Tung Chow, China, November 2, 1886; that witness moved to Fredericksburg, Va., about four years prior to the date of the trial of this suit, her intention being to avail herself of the opportunities afforded at Fredericksburg for the education of her children; that deceased was an excellent swimmer; that she had seen him swim in matches in China; and (omitting that part of her evidence already stated) the witness further says that the day of deceased's drowning was the first day of the opening of the Jamestown Exposition, and was very warm for the season. On cross-examination, the witness testified that she had attended to room of the deceased in which he usually slept, during his lifetime; that she had never known him to drink intoxicating liquor, had never seen any in his room, had never smelled any on his breath; that she had been informed after January 19, 1907, by Prof. Sommerville, that he had been told that her son, the deceased, had taken some liquor at the college rehearsal; that while she knew Prof. Sommerville to be an entirely creditable man and a friend of hers, who imparted said information in a friendly

manner, she did not believe it.   Witness further testified (and this is not controverted) that deceased had, prior to December 7, 1906, two policies in defendant company (plaintiff in error) each for $500, which she thought he had given up to take out the policy sued on, which had more advantageous conditions.

We have set out in inverse order the evidence in chief, for the reason, *first,* that the burden of proof to establish the materiality of the concealment or misrepresentations relied on by plaintiff in error to avoid the policy sued on, as well as the fraudulent intent, and that the policy was avoided by virtue of the failure of the applicant to answer the questions propounded to him by the medical examiner in accordance with the stipulations of his application, was upon the plaintiff in error (Elliott on Ins. 118; 25 Cyc. 928; *Wytheville Ins. Co.* v. *Stultz,* 87 Va. 634, 13 S. E. 77; *Home Ins. Co.* v. *Sibert,* 96 Va. 406, 31 S. E. 519) ; and *second,* because defendant in error (plaintiff below), as shown by her own statement and the letters of plaintiff in error which she produced to the jury, knew of no defense to be made to the payment of the policy, other than that "by lapse, suicide," until the trial of the case was on.

Upon the issue of suicide, the "star witness" for plaintiff in error is Hawkins, whose evidence on the other branch of the case is given above.   After stating that on the date of deceased's death, witness and Fairfax were with deceased at a saloon together, and although deceased did not drink with them or get liquor at the saloon, he frequently went to a closet connected with the saloon. and appeared to be getting intoxicated, and became very drunk; that witness and Fairfax took deceased up the Boulevard to sober him up,   *   *   *   turned back and came down the Boulevard, and "went down to the steamboat wharf, the deceased all the while getting drunker; arriving at steamboat wharf witness took deceased's coat off and laid deceased in the shade of the freight house, and then witness walked down the river shore about one hundred or more yards and watched some men loading ties; that witness heard a splash in the water, or heard some one holler, and saw that deceased was

in the river swimming easily with the breast stroke and apparently making for the Stafford shore almost at right angles to the Fredericksburg shore line; and deceased had on his coat, shoes and all of his clothes, except his hat   *   *   *  ; that deceased looked backward at witness and smiled, but kept swimming easily   *   *   *  ; that when about the middle of the river deceased threw both hands up above his head a few inches,   *   * sank out of sight; that deceased was apparently a good swimmer; that it was easier to get out of the river on the Stafford shore than on the Fredericksburg shore and that he did not know whether deceased was taking a bath or fooling;   *   *   * that prior to drowning there was nothing in deceased's conversation or demeanor to indicate suicide; that deceased told him he was an excellent swimmer and had certificate for winning swimming match; that steamboat wharf inclined steeply to river, and deceased probably stumbled off wharf; that on morning of death of assured he and witness had been planning to buy a horse in partnership for purpose of canvassing their business in country."

What became of Fairfax, the companion of Hawkins, and why he was not examined as a witness in this case, is not shown by the record.

In rebuttal, defendant in error introduced seven witnesses. The first, W. E. Carson, testified "that the tide was ebbing and about half out, and that when the swimmer (deceased) was . *   *   * apparently swimming easily and evenly, his head and hands appeared above the water   *   *   * and he sank and rose no more." That steamboat wharf was 8 or 10 feet above the water; that the bank on the Stafford side of the river was much lower than on the Fredericksburg side; and that one could easily get from the water on the Stafford side of the river.

James M. and Marshall Turner both testify, "that steamboat wharf was 10 or 12 feet higher than water in the river, and had a sharp slope downward from the freight house to the water's edge—sharp enough for a barrel or a person lying down to roll

off the wharf into the river." James M. Turner further says that he did not witness the drowning and did not know deceased, but that on the day of the drowning he observed three men, Hawkins, Fairfax and deceased going towards steamboat wharf; that deceased appeared very drunk, and his companions were half dragging and half toting him; that deceased's head was hanging forward with his chin nearly or quite on his breast, and that witness knew a drunken man, should he fall into the water, might be very much revived by contact with the water, and that one too drunk to walk might yet swim very well.

J. W. Masters, says that he was familiar with the steamboat wharf, and corroborates the Turners as to its height above the water, and the sloping of the wharf toward the water; that the Stafford shore, opposite the steamboat wharf was lower, and that one in the water could easily get from the water to the Stafford shore, while considerable difficulty would be experienced in getting from the water to the Fredericksburg shore; * * * that a person very drunk might be sobered * * * by sudden contact with water, and that drunkenness did not necessarily affect ability to swim. The witness further says that he "was there about two minutes after the drowning, and the impression upon him from what he heard and saw was, that DeVault either rolled or staggered into the water."

It is readily to be observed that the testimony on this branch of the case, even that of the witness, Hawkins, shows not a single circumstance connected with or surrounding the death of DeVault, the insured, that is not as consistent with accident as with suicide.

"The defense of suicide, to avail, must show that every hypothesis of accidental death is excluded by the evidence. * * * The burden of proving the defense of suicide was on the defendant. * * * Where the evidence of self-destruction is circumstantial, the defendant fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident." *Cosmopolitan L. Ins. Co.* v. *Koegel,* 104

Va. 633, 52 S. E. 166, and authorities there cited. See also *Boynton* v. *Equitable L. A. Co.,* 105 La. 202, 29 South. 490, 52 L. R. A. 687; *Brown* v. *Sun L. I. Co.* (Tenn. Ch. App.), 57 S. W. 415, 51 L. R. A. 252; *Mu. L. I. Co.* v. *Wiswell,* 56 Kan. 765, 44 Pac. 906, 35 L. R. A. 258; 2 Bac. Ben. Soc. p. 849; *Standard L. Ins. Co.* v. *Thornton,* 100 Fed. 582, 40 C. C. A. 564, 49 L. R. A. 116.

In the last cited case it is said: "Accidental death will be presumed, and this presumption must be overcome by the proof of facts which exclude every hypothesis of death except by suicide."

The case before us is clearly one in which this court would not be warranted in disturbing the finding of the jury, that the insured's death was by accident and not by suicide.

Coming then, to the remaining witnesses who testify in rebuttal as to habits of deceased with respect to the use of alcoholic stimulants at and prior to the date of the policy sued on: G. R. Swift, Commonwealth's attorney for Fredericksburg, says that he boarded at Mrs. Barney's, had known deceased three or four years, that deceased in 1906 ate his meals at Mrs. Barney's at table with witness, that witness never saw deceased drunk, nor take a drink, nor smelled liquor on his breath. On cross-examination witness stated that he meant to tell the jury that he had never seen deceased take a drink of liquor, or under its influence, but did not intend to say that deceased could not have been under its influence without witness having observed it; that he knew deceased well and never had known or heard of his drinking prior to March, 1907.

Dr. J. N. Barney testified that "deceased ate at his table in 1906 and witness had known deceased for 4 years or more, never knew deceased to be under the influence of liquor or to take a drink, never smelled it on him * * * ; that he never heard of his drinking till late in March, 1907."

W. Mayo Smith, about 23 years of age, a bank clerk and friend of deceased, says he had known him four or five years;

that he had taken his meals with deceased at Dr. Barney's; slept with deceased in same room and bed in 1906, and never known deceased to take a drink, or be drunk, or under the influence of liquor, had heard that deceased drank, and in the spring of 1906 had talked with deceased about his drinking, and deceased promised him "to cut it out," and witness had no reason to believe from intimate acquaintance with deceased that he had drunk liquor since his promise up to December 7, 1906, the date of the policy sued on. This witness further says that he spent his evenings like a good many other men calling on the girls and his friends, that sometimes the deceased also called on the girls with him, but frequently did not; that witness was in the bank from nine o'clock in the morning until four in the afternoon and never knew deceased to get drunk until March, 1907.

In the light of this evidence, considered by the jury in connection with that of defendant in error, the application for the policy, the medical examination and the report thereon to the home office of the inspector (in which Hanway, assistant superintendent, in response to inquiry 9: "What does outside inquiry into applicant's habits disclose?" answered, "Good;" and signed the certificate, containing: "Above is the result of my personal, careful investigation. I regard the risk as suited for the ordinary department, and I do recommend the issuance of the policy;" again, "on the basis of statements given in part 'A' and inquiry made of parties in Fredericksburg, Va., I deem this risk as measuring up to the standard of the ordinary department, and can recommend its acceptance"), which report of inspection was introduced by plaintiff in error at the trial, without reservation, restriction or limitation as to any of its parts, it was quite natural for the jury to conclude, not only that the policy was not issued solely on the representations of deceased in his application, but as the result of "outside inquiry into applicant's habits;" and that the evidence given by plaintiff in error's leading witness, Hawkins, who had to con-

fess that while he, an habitual drinker, had smelled liquor on deceased's breath when others daily associating with him, eating with him at the same table, and one sleeping with him, never did, he had never seen him under the influence of liquor until December 24, 1906, some time after the policy had issued, was entitled to little or no weight. Nor is it surprising that the jury, the sole judges of the credibility of the witnesses and the weight to be given to their evidence, should have discredited the improbable story of the witness, Sam Jones (colored), who not only contradicted the witness, Hawkins, as to deceased's being drunk December 24, 1906, but is himself discredited by Mr. Goolrick, another witness for plaintiff in error, as to decedent's condition on that occasion.

The evidence, as doubtless the jury viewed it, fails to show that deceased drank at all at the time of his application or for months prior theretofore; or that he ever drank *to excess* prior to the issuing of the policy. There is nothing in the evidence justifying the statement on plaintiff in error's brief, that deceased had stated "that he had acquired the habit of drinking in China," but the most that can be made of it is that he (deceased) had stated that "he had taken drinks in China."

In *Knickerbocker L. Ins. Co.* v. *Foley,* 105 U. S. 350, 26 L. Ed. 1055, Mr. Justice Field, speaking for the court, says: "No witness testified from his own knowledge, that deceased was of intemperate habits at the time he applied for the insurance and that he had always been so.    *    *    *    The court did not, therefore, err in instructing the jury that if the habits of the insured 'in the usual, ordinary and every day routine of his life were temperate,' the representations made are not untrue, within the meaning of the policy, although he may have had an attack of *delirium tremens* from an exceptional over-indulgence. It could not have been contemplated from the language used in the policy that it should become void for an occasional excess by the insured, but only when such excess had by frequent repetition become a habit."

The opinion in that case goes further than it is necessary to go upon the facts in this case, but its reasoning is cogent and apposite.

We are of opinion that the evidence in this case fully sustains the verdict of the jury in favor of the defendent in error upon both questions submitted to them, and therefore, the judgment thereon complained of must be affirmed.

*Affirmed.*