JOHN J. MCDANIEL *et al. v.* METROPOLITAN LIFE INSURANCE COMPANY

(No. 8680)

Submitted January 25, 1938.   Decided March 1, 1938.

*Harriet L. French*, for plaintiff in error.
*Martin & Martin*, for defendants in error.

FOX, JUDGE:

The plaintiffs, John J. McDaniel and Rosetta McDaniel, beneficiaries under a life insurance policy issued by the defendant, Metropolitan Life Insurance Company, to Charlie J. McDaniel, sued in the circuit court of Mercer County to recover the face of the policy. The policy is dated December 1, 1934, and contains the following provision:

> "If the Insured within one year from the date of issue hereof die by his own hand or act, whether sane or insane, the liability of the Company hereunder shall be limited to an amount equal to the premiums which have been received, without interest."

Charlie J. McDaniel died on the 27th day of June, 1935, and the defendant, in its specification of defense, alleges that "the insured died by his own hand or act and committed suicide on the 27th day of June, 1935, and within one year from the date of the issue of said policy." Upon the issue made up on this defense, a trial before a jury was had, resulting in a verdict for the plaintiffs for the face of the policy. A motion to set aside the verdict was made, the same overruled, judgment rendered thereon, and proper exception was taken. To this action of the trial court, defendant prosecutes this writ of error.

The insured was a coal miner and had been employed in

that occupation for about a year preceding his death. He had been living with his uncle until a short time before his death, but owing to some slight and unimportant disagreement between them, he left his uncle's home and lived at the home of John Dollinger. In December, 1934, in the course of his employment, he suffered an injury to his spine, for which he had been hospitalized, and at the time of his death he was receiving compensation from the Workmen's Compensation Fund. The evidence is somewhat in conflict as to the extent of his recovery from such injury. Some of the evidence tends to show that he had practically recovered and was eager to return to work; other is to the effect that he had complained of his injury as being of such a character as to prevent him from ever returning to work, and that he was in fear that payments of compensation would end; that he was worrying over this situation. By some witnesses he is represented as being a happy, care-free individual; by others as being at times depressed and despondent. The evidence as to his mental attitude shortly and immediately before his death may be reasonably interpreted as establishing that at times he was care-free and happy, and at other times subject to periods of despondency. There is no particular inconsistency in this testimony. The average man is given to recurrent periods of happiness and despondency. It is a human trait. In many cases, the heights of optimism and happiness are followed by the deepest moods of depression. Pendulum-like, one extreme is followed by the other. Few people are able to accept the tides of fortune, good or bad, with equanimity. Here we have a naturally happy disposition, coupled with pain and worry resulting from a physical injury; a natural setting for an act of desperation.

The tragedy which resulted in the death of the insured occurred in the Dollinger home, and three people were in and about the home at that time. Two of them, Mrs. John Dollinger and her daughter, Elsie Boone, testified at the trial. John Dollinger, the other party present, died before the trial. The testimony of Mrs. Dollinger and Elsie Boone is that on the day of the death of the insured, he

came to their home about 11 o'clock in the morning and told them that "I have got my insurance paid up. If anything would happen the old man would get a good haul." About 1 or 1:30 o'clock, when some of his acquaintances were starting to work, he remarked, "I would give anything on earth to be able to make a shift like the others was." About fifteen minutes later, he arose from a chair or other seat, put his hand on his back and said, "My back hurts me worse today than it did when I left the hospital", and then went upstairs. Mrs. Dollinger and her daughter then went to the kitchen of the home and about ten minutes after the insured had gone upstairs, a shot was heard and a "lumbering fall." Mrs. Dollinger then ran to her husband, who was sitting on the porch, and immediately thereafter, Dollinger went up to the room of the insured. He was found lying on the floor on his back, his head close to the door, with a gun-shot wound in his head, and a pistol between his knees, the muzzle pointing in the direction of his body. The pistol was fully loaded except that one cartridge had been fired. A physician was called immediately, the insured removed and taken to a hospital at Welch, where he died shortly thereafter. The pistol and the cartridges were turned over to a constable, who later met an accidental death, and neither the pistol nor the cartridges could be located and produced at the trial.

The bullet from which the insured died entered the right temple near the ear and ranged through the head, possibly a little upward, emerging from the skull a little above the left ear. It passed through a window of the room at an elevation of about five feet from the floor and there is evidence that a boy heard the report of the shot and saw glass from this window fly outward, and pieces of glass were found outside the window. A dent was discovered in the wall of a neighboring building, some twelve feet from the ground, presumably caused by a bullet, and a bullet was found on the ground nearby and turned over to John Dollinger. On account of Dollinger's death, it was not produced at the trial. When the physician was called, he washed the wound, removed the blood stains, and did not observe any powder marks. No

inquest was held and no particular effort was made to ascertain the existence or non-existence of powder marks until the body was examined, after preparation for burial, by a coroner at the insured's home town in Virginia, where the body was taken for interment. There is no evidence in the record showing the existence of powder marks. The entrance wound was small and round; the exit wound larger.

The defendant, in relying upon suicide as a defense to this action, assumes the burden of proof on that point. There is a presumption of law against suicide. *Mallory* v. *Travelers' Insurance Company,* 47 N. Y. 52, 7 Am. Rep. 410; *Krogh* v. *Modern Brotherhood,* 153 Wis. 397, 141 N. W. 276, 45 L. R. A. (N. S.) 404; *Bohaker* v. *Travelers' Insurance Company,* 215 Mass. 32, 102 N. E. 342, 46 L. R. A. (N. S.) 543; *Agen* v. *Metropolitan Life Ins. Co.,* 105 Wis. 217, 80 N. W. 1020, 76 Am. St. Rep. 905; *Metropolitan Life Ins. Co.* v. *DeVault's Admx.,* 109 Va. 392, 63 S. E. 982, 17 Ann. Cas. 27. Where suicide is relied upon as a defense, proof thereof "must be clear and satisfactory, and where circumstantial evidence is relied upon for such purpose, such circumstances must establish that death resulted from suicide to the exclusion of every reasonable hypothesis consistent with death from natural causes." *Goodbar* v. *Western and Southern Life Ins. Co.,* 89 W. Va. 221, 108 S. E. 896; *Life Ins. Co. of Virginia* v. *Hairston,* 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989. But the presumption against suicide "is merely a circumstantial inference selected by the law as the most rational hypothesis from given facts, and may or may not be rebutted according to the quality of evidence introduced. It yields to direct, positive, and uncontradicted evidence, i. e., it gives way to proved facts." *Jefferson Standard Life Ins. Co.* v. *Bentley,* 55 Ga. App. 272, 190 S. E. 50, 57.

> "The fact of suicide must be established by a preponderance of the evidence, but the presumption against it is not conclusive and will vanish upon proof of physical facts clearly inconsistent therewith."

*Gem City Life Ins. Co.* v. *Stripling,* 176 Ga. 288, 168 S. E. 20, 21. See also *King* v. *New York Life Ins. Co.,* 28 Ga. App. 607, 112 S. E. 383; *State ex rel. Hawkins* v. *Industrial Commission,* 157 Minn. 33, 195 N. W. 766, 36 A. L. R. 394. The presumption against suicide is not evidence and does not regulate or change the burden of proof. *Travelers' Ins. Co.* v. *Wilkes,* 76 Fed. (2d) 701; *Watkins* v. *Prudential Ins. Co.,* 315 Pa. 497, 173 A. 644, 95 A. L. R. 869; *Jefferson Standard Life Ins. Co.* v. *Clemmer,* 79 Fed. (2d) 724, 103 A. L. R. 171. In the case of *New York Life Ins. Co.* v. *Gamer, Ex'trx.,* 58 S. Ct. 500, 503, 82 L. Ed. 480, decided by the Supreme Court of the United States on February 14, 1938, that court, discussing the force of the presumption against suicide, said:

"Upon the fact of violent death without more, the presumption, i. e., the applicable rule of law, required the inference of death by accident rather than by suicide. As the case stood on the pleadings, the law required judgment for plaintiff. (*Travelers' Ins. Co.* v. *McConkey,* 127 U. S. 661). It was not submitted on pleadings but on pleadings and proof. In his charge the judge had to apply the law to the case as it then was. The evidence being sufficient to sustain a finding that the death was not due to accident, there was no foundation of fact for the application of the presumption; and the case stood for decision by the jury upon the evidence unaffected by the rule that from the fact of violent death, there being nothing to show the contrary, accidental death will be presumed. The presumption is not evidence and may not be given weight as evidence."

"Courts have frequently remarked that presumptions are only intended to take the place of facts, and cannot be relied upon where the facts are shown; or that no presumption can stand in the face of facts. According to such authorities a presumption is an artificial thing, a mere house of cards, which one moment stands with sufficient force to determine an issue, but at the next, by reason of the slightest rebutting evidence, topples utterly out of consideration of the trier of facts."

Jones Commentaries on Evidence (2d Ed.), sec. 32. 5 Wigmore on Evidence (2d Ed.), sec. 2491; 10 R. C. L. 867, sec. 10; *Modern Woodmen* v. *Craiger*, 175 Ind. 30, 92 N. E. 113, 93 N. E. 209.

The rule governing the presumption of law against suicide and the rebuttal thereof being clearly defined by the authorities above cited, we come to the application of those rules to the facts of this case. "Verdict must be rested on substantial evidence, not vague conjectured possibilities." *Equitable Life Assurance Society* v. *Guiou, et al.*, 86 Fed. (2d) 865. And "if all fair-minded men would agree that, under the evidence offered, death of insured was the result of suicide rather than accident, the court should decide the question as one of law." *Green* v. *New York Life Ins. Co.*, 192 Iowa 32, 182 N. W. 808. See also, *Agen* v. *Metropolitan Life Ins. Co.*, *supra*.

That the insured met his death by a gun-shot wound is not questioned, and his death resulted either from homicide, from accidental discharge of the pistol found near his body, or by his own intentional act. There is not the slightest evidence of homicide in this case, and there is no legal presumption of murder. *Fidelity and Casualty Company* v. *Egbert*, 84 Fed. 410. The claim that the death of the insured resulted from an accidental discharge of a pistol is, in our opinion, met by the physical facts which show that the bullet which caused his death entered the skull in the right temple, passed through his head and through a window of the room where the tragedy occurred in a direct line from the entrance wound to the hole in the window glass, showing conclusively that the pistol must have been fired at or near the head of the insured while he was in a standing position. There is no other reasonable explanation of these undisputed physical facts. It is impossible to conceive how such a wound could have been inflicted by the falling of the pistol to the floor, or the striking of any other object which would cause it to be fired. All presumptions give way to these facts, and they exclude any reasonable hypothesis that the death of the insured came about in any manner other than by his own intentional

act. We hold that, as a matter of law, the trial court would have been warranted in directing a verdict for the defendant as to any sum in excess of the premiums paid on the policy.

The plaintiffs would cast doubt upon the claim of suicide by saying that there was no evidence of powder burns on the body of the insured, and they introduce evidence of tests made shortly before the trial, in an effort to show the probability, or the certainty, that powder burns would have been present had the insured intentionally fired the fatal shot. As noted above, the pistol which caused the death of the insured could not be produced at the trial, nor could the unexploded cartridges. We are therefore without information as to the character of the pistol found at the body, other than its make and caliber, or as to the cartridges used therein, and the lack of this information reflects upon the weight which should be given to the various tests made as shown by the testimony. The authorities on gunshot wounds do not lay down any inflexible or infallible rule as to the presence of powder burns in any case; whether they appear, and if so, to what extent, depends on the character of the gun used, the kind of powder, the distance from the body, and many other conditions and circimstances. Ordinarily, where a pistol is discharged, near a body, powder burns will show, but the appearance thereof, and their removal, is largely dependent upon the kind of powder used. Here, no powder burns were observed, as appears from the evidence, but blood was wiped from the wound shortly after the tragedy, and no real investigation as to powder burns was made until two or three days later. In our opinion, the physical facts exclude the idea of accidental discharge of the weapon, but if there had been such an accident, the existence of powder burns, considering the surroundings and circumstances, was just as probable as if the wound had been intentionally self-inflicted. If we assume that the absence of powder burns shows that the pistol was discharged at some distance from the insured, then we are driven to the assumption that the pistol was fired by some person other than the insured, and, as stated above,

there is absolutely nothing in the record upon which any such assumption can be based. With all of the uncertainty surrounding the application of any fixed rule or guide in relation to powder burns, and in the face of physical facts to which we have alluded, the jury was not warranted in finding that the insured came to his death by means other than by his own intentional act. We are not at liberty to indulge in conjecture and mere possibilities.

The judgment of the circuit court is reversed, the verdict set aside and the case remanded for a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*