## TRAVELERS INDEMNITY CO. v. PLY-MOUTH BOX & PANEL CO.

No. 4326.

Circuit Court of Appeals, Fourth Circuit.
Oct. 4, 1938.

Leon T. Seawell, of Norfolk, Va. (Worth & Horner, of Elizabeth City, N. C., Hughes, Little & Seawell, of Norfolk, Va., and W. A. Worth, of Elizabeth City, N. C., on the brief), for appellant.

W. B. Rodman, Jr., of Washington, N. C. (Rodman & Rodman, of Washington, N. C., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

In this case the Travelers Indemnity Company has appealed from a judgment against it in the District Court in a suit at law tried to a jury, in the amount of $14,775, and interest, in favor of the Plymouth Box and Panel Company, a corporation, to which the Indemnity Company had issued a policy of accident-explosion insurance covering a steam turbine. The accidental explosion occurred on August 22, 1936, while the policy was in force; and it is conceded by the insurer that the loss was covered by the policy, the only issue in the case being the monetary extent of the loss. The assignments of error are directed to a certain part of the District Judge's charge to the jury, to particular rulings on the evidence, and to the overruling of a motion for a new trial. The case involved essentially only an issue of fact. We have reviewed the record, and have concluded that it presents no reversible error. A brief summary of the case will indicate the reasons for our conclusion.

The policy sued on is a long and complex document, called a "Conference Form policy for Boiler or Machinery Insurance". Annexed to the main policy contract are various schedules and special endorsements; but reduced to its. simplest terms, and as applicable to the particular case, the contract between the parties was as follows. The exact risk assumed was loss caused by accidental explosion of an Allis-Chalmers steam turbine situated in the veneer plant of the Plymouth Box and Panel Company at Plymouth, North Carolina. The policy defined accidental explosion to "mean a sudden and accidental tearing asunder of the object or any part thereof caused by pressure of steam therein; or sudden and accidental disrupting of its rotating members into two or more parts". As to loss so caused and to an extent not exceeding $25,000, the insurer agreed "to pay the insured for loss on the property of the insured directly damaged by such accident (or, if the Company so elects, to repair or replace such damaged property)," with certain exclusions not material in this case. With respect to the determination of the amount of the loss, one of the policy conditions provided:

"The Company shall not be liable as respects the property of the Assured damaged or destroyed, for more than the actual cash value thereof at the time of the accident. If as respects the damaged property of the Assured the repair or replacement of any part or parts of an object is involved, the Company shall not

220

be liable for the cost of such repair or replacement in excess of the actual cash value of said part or parts or in excess of the actual cash value of the object, whichever value is less. Actual cash value in all cases shall be ascertained with proper deductions for depreciation, however caused."

The policy also provided in Condition 7 that in the event of disagreement between the Company and the Assured as to the amount of loss for which the Company is liable, it should be determined by appraisal and award at the election of the Assured (but, not of the Company).

The steam turbine covered by the policy is described in the evidence. It was a machine used for the purpose of producing electricity to run the entire veneer plant. The unit consisted of two parts, a turbine and a generator, connected by a shaft, the function of the turbine being to generate the mechanical power which was transmitted through the shaft into the generator which produced the electrical energy. The whole machine was 18 to 20 feet long by 6 to 8 feet high and weighed about 90,000 pounds. The generator part included a rotor which was a solid cylinder of steel 24 inches in diameter. The cause of the accidental explosion (as defined in the policy) was that this cylinder for some unknown reason "had split through the middle across the axis and a portion split the other way—split longitudinally from the center crack toward the turbine end". There was contradictory evidence as to whether the final break was due in part at least to a previously existing partial crack in the cylinder. The connecting shaft or spindle between the turbine and the generator was also bent out of alignment to an extent variously estimated at from $\frac{1}{16}$ to $\frac{1}{64}$ of an inch. The result of the accident was to render the machine as an entity functionally useless, although the turbine end was not physically damaged. After the loss had occurred the insurer elected to pay the loss instead of repairing or replacing the damaged parts, but the parties disagreed widely as to the amount, and the insured did not exercise its option for an appraisal and award. This suit necessarily resulted.

The evidence placed before the jury wholly related to the monetary extent of the loss and damage to the machine caused by the accident. It was shown that the machine had been manufactured by the Allis-Chalmers Company in 1920, and was first installed and placed in operation at the plant of the Essex Cotton Seed Company in Passaic, New Jersey, in April 1921. To what extent it had been actually used there does not appear, as it was stated that that Company had gone out of business several years before September 1929, when the machine was purchased from the Essex Company by the corporate predecessor of the Plymouth Company, and installed in the veneer plant at Plymouth, North Carolina. The purchase price was $15,000 f. o. b. Passaic, N. J., including, however, a condenser not covered by the policy. The generator was of 1500 k. w. capacity; and the machine had functioned satisfactorily and efficiently for the generation of electricity for the veneer plant since its installation. It was currently inspected from time to time by representatives of the insurer during this period, and was in fact in the course of further inspection at the time of the accident.

Both parties were permitted by the District Judge to develop in the testimony their respective contentions regarding the amount of the loss. Thus evidence was admitted on the part of the plaintiff that in 1936 the cost new of another Allis-Chalmers steam turbine of the same capacity installed at Plymouth was $42,000; that the salvage value of the turbine and generator after the accident was not more than $500; that the insured had offered the salvage to the insurer at that price; that the insured had given to the insurer a written estimate of the cost of replacing the broken generator with the necessary incidental parts, based on estimate of prices obtained from the Allis-Chalmers Company in the amount of $14,742, which included an item of only $245 for straightening the shaft as to which, however, the plaintiff contended it could not be safely re-used after straightening, and would have to be replaced by an entirely new shaft at a cost of $5,500; that the insured had actually replaced the damaged machine with another second-hand machine of the same capacity but of different make at a cost of $14,752.06, and that in addition to the purchase price, which did not include the full cost of labor necessary for installation, the Plymouth Box and Panel Company "had to agree to fur-

nish the Virginia Electric Power Company all of its surplus power and act as a stand-by in serving them". On the other hand, the defendant was allowed to introduce evidence to the effect that only the generator portion of the machine and the connecting shaft had been damaged; that the shaft could be straightened and safely thereafter used; and that there was no damage to the turbine portion of the machine; and also particularly the defendant was allowed to submit expert opinion evidence as to the rate of depreciation properly applicable to the machine and its several parts (which, by one witness was fixed as to the generator at accumulated depreciation of 55% of the cost new); and the fair value of necessary replacements to the machine, with proper deductions for depreciation were by various expert witnesses estimated at from $4,000 to $7,000. On the whole evidence the plaintiff contended that the damage amounted to $20,477; and the defendant placed it between $6,000 and $7,000. The verdict of the jury was for $14,775 with interest from October 24, 1936.

By the judge's charge the jury were instructed as to the measure of damages in the language of the policy conditions above quoted, with particular emphasis on the duty to make proper deduction for depreciation; and, as requested by counsel for the insurer, that in determining value they should consider market value and not intrinsic worth of the machine to the insured, based on its operating efficiency. No exception was taken to the charge in this respect, but the principal contention now by the insurer is that, in view of the charge, with particular reference to what was said as to market value, "no evidence was submitted by the plaintiff to sustain the burden upon it to establish the actual cash value of the part which was destroyed, and that the only evidence from any one competent to speak upon such a subject was that furnished by the Insurer itself, and which establishes a value a great deal lower than the amount awarded by the jury". This contention was urged upon the trial judge on the motion for a new trial, which was overruled in his discretion, and does not constitute reversible error here, save in exceptional circumstances clearly showing an abuse of discretion. Fairmount Glass Works v. Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439; Carter Coal Co. v. Nelson, 4 Cir., 91 F.2d 651; Roedegir v. Phillips, 4 Cir., 85 F.2d 995; Hughes Federal Practice, Vol. 5, § 2902.

But even if the point made were open for our consideration on the merits, it is clear that it could not be sustained. Counsel for the insurer took no exception to the charge as to the measure of damages, and requested no specific instruction other than that given, and did not ask for a directed verdict, either absolutely for the defendant, or as to the maximum amount of the jury's verdict. As the machine was not wholly destroyed, and could be repaired by replacement of the generator and shaft, the precise question for the jury to determine under the applicable policy condition was the cash value of the parts which had to be replaced, with due allowance for accrued depreciation, and not in excess of the actual cash value of the whole machine. The insurer would have been entitled to a specific instruction to the jury to this effect if it had been requested; but as it was not, objection cannot now properly be made to the more general language of the charge to which no exception was taken at the time.

In fact the charge as given at the request of the insurer was, if anything, too favorable to it in the emphasis placed upon market value instead of the policy requirement as to cash value. There is no single and invariable legal rule or formula for the determination of actual cash value applicable to all kinds of property. Market value is of course the standard rule when we are dealing with the kind of property which is freely and currently bought and sold; but where this condition does not prevail, other tests of value must be considered; and this is necessarily often true with respect to second-hand machinery of a particular make. In various cases, depending upon the nature of the property to be valued, evidence may properly be received as to the original cost, and cost of replacement, with due allowance for depreciation, and, where we are dealing with productive property, net income from its rental or other utilization; and in limitation of the valuation, as by the special condition of this policy, evidence may be received of sound value before the loss. McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 159 N.E. 902, 56 A.L.R. 1149, and anno-

tations 1155, 1162; Western Massachusetts Insurance Co. v. Transportation Co., 12 Wall. 201, 20 L.Ed. 380; Westchester Fire Ins. Co. v. Bringle, 6 Cir., 86 F.2d 262, 264; Chicago & E. R. Co. v. Ohio City Lumber Co., 6 Cir., 214 F. 751; Boggan v. Horne, 97 N.C. 268, 2 S.E. 224; Palmer v. North Carolina State Highway Comm., 195 N.C. 1, 141 S.E. 338; Boyd v. Royal Ins. Co., 111 N.C. 372, 378, 16 S.E. 389; Grubbs v. Insurance Co., 108 N.C. 472, 480, 13 S.E. 236, 23 Am.St. Rep. 62; Richards on Insurance (4th Ed.) § 225; Couch Cyc. of Ins. Law, Vol. 7, §§ 1840, 1841.

■ In this case there was little, if any, evidence as to the true market value of this second-hand used machine; and what the insurer chiefly relied on in this respect was really opinions of sound value less estimated theoretical depreciation; but there was quite substantial evidence as to (1) the sound value of the machine as a whole before the accident; (2) the cost of replacement of the damaged parts, and (3) the proper amount of accrued depreciation to deduct therefrom. It was conceded that the generator was a total loss and there was substantial evidence for the jury to consider that the shaft was also so damaged that it could not be safely again used, even after being heated and straightened, although there was also substantial evidence to the contrary. There was practically no dispute that the cost of a new generator of the Allis-Chalmers make (which apparently it was necessary to obtain if the old turbine was to be used) with the necessary incidental parts and cost of installation was about $14,500; and the cost of a new shaft if necessary was $5,500. Both of these amounts were subject to proper deduction for depreciation, but the amount so to be deducted was seriously in dispute. It was variously estimated by the insurer's witnesses at amounts varying from 37½% to 55% or more; but this was disputed by the insured as theoretical only, and to be discounted by the operating efficiency of the machine. There is probably no more difficult question for a jury to determine than the proper amount of accrued depreciation on used machinery of this type. If they found, as they could have done under the evidence, that the cost of new replacement approximated $20,000, it is evident that they did make a substantial deduction for depreciation. They also had the evidence before them that the value of the salvage in the damaged machine was not more than $500, and the cost to the insured of another second-hand machine of the same capacity but of another make, not shown to have been more valuable or useful to the insured, was something more than $14,702.56. While this latter consideration was not the exact measure of damages set up in the policy condition, it was of some value as a check on the jury's findings of the cost new of the parts to be replaced, less depreciation. In any event there is nothing to indicate any abuse of discretion by the trial judge in refusing to grant a new trial, as he doubtless would have done if he had felt the damages found by the jury were excessive.

■ In his charge to the jury, in stating the respective contentions of the parties, the Judge referred to the plaintiff's contention that the inspection of the machine by the insurer's agent and subsequent writing of the policy in the amount of $25,000 was some evidence of the fair value of the machine prior to the loss. To this part of the charge the appellant specially excepted at the time. It will be noted, however, from the charge as a whole that the Judge was then merely reviewing the contentions of the parties rather than instructing the jury as to the legal measure of damages. Later in the charge in reviewing the defendant's contention, it was pointed out that its answer to the plaintiff's argument in this respect was that the insurer merely wrote the policy in the amount requested by the insured without undertaking to then appraise the value of the machine. At most the charge on this point merely left to the jury the consideration of what weight the inspection by the insurer's agent before writing the policy had on the controversy as to the sound value of the machine, as to which there was conflicting opinion evidence. There are particular situations in which such evidence has been held admissible in relation to sound value (Maryland Home Fire Ins. Co. v. Kimmell, 89 Md. 437, 442, 43 A. 764); especially where there is an applicable statute, as in North Carolina, in *fire* insurance underwriting, which limits the amount of the insurance to be written to the fair value of the property (North Carolina Code, 1935, § 6418; Queen v. Dixie Fire

Ins. Co., 177 N.C. 34, 97 S.E. 741); but when the policy is open (and especially where it as originally written covers property other than that involved in the loss) as in this case, and not valued, it is not often a circumstance of substantial weight. It might have been better if the Judge had expressly said so in his charge in this case; but in view of the charge as a whole, and all the circumstances of the case, we do not think the failure to do so constituted prejudicial error.

■■■■■ We have considered but fail to find any reversible error in the several assignments of error based on exceptions to the evidence. The questions raised thereby are only such as frequently arise in practice in valuation cases of this nature. It is unnecessary to review them separately. What has already been said is sufficient to indicate that no material evidence offered by either party was improperly omitted or rejected. Appellant particularly alleges error in the admission of the testimony of the plaintiff's witness, Still, as to the sound value of the machine before the accident, on the ground that he was not qualified to express an opinion; but it appears from the record that he was the president of the insured and had been familiar with the particular machine in operation for several years. As the owner's representative he was therefore entitled to express an opinion as to value, the weight of which was wholly for the jury. Wigmore on Evidence, 2d Ed., Vol. 1, § 716; Barrett v. Fournial, 2 Cir., 21 F.2d 298; Chicago & E. R. Co. v. Ohio City Lumber Co., 6 Cir., 214 F. 751; Union Pac. R. Co. v. Lucas, 8 Cir., 136 F. 374.

■■■■ As the policy sued on was apparently a North Carolina contract and the case was tried in a federal district court in North Carolina, where the jurisdiction of the court was based on diverse citizenship only, the law applicable to the case was that of the State of North Carolina. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290. But counsel have not referred us to any statutes or judicial decisions of the State of North Carolina contrary to the views herein expressed, nor have we found any.

It results that the judgment appealed from should be and is hereby affirmed.