**HOME LIFE INS. CO. OF NEW YORK v. MOON.**

**MUTUAL BENEFIT HEALTH & ACCIDENT ASS'N v. SAME.**

Nos. 4571, 4572.

Circuit Court of Appeals, Fourth Circuit.

March 11, 1940.

Before SOPER and DOBIE, Circuit Judges, and H. H. WATKINS, District Judge.

Wilbert H. Norton, of Huntington, W. Va., for appellant Mutual Benefit Health & Accident Ass'n.

Harry Scherr, of Huntington, W. Va., for appellant Home Life Ins. Co. of New York.

Thomas W. Peyton, of Huntington, W. Va. (Ernest E. Winters, Jr., of Huntington, W. Va., on the brief), for appellee.

DOBIE, Circuit Judge.

This case involves two civil actions which, as they both involved the same single question, were, by agreement of counsel and with the consent of the court, tried together in the District Court and were by us heard together on appeal. Harriet Moon, wife of the insured as well as beneficiary under all of the insurance policies in question and plaintiff in both actions, is for convenience hereinafter called the appellee; Charles Moon (her husband), whose life was insured under these policies, is called the insured; while the defendant-insurers, the Home Life Insurance Company and the Mutual Health and Accident Association, are called the appellants.

The first action was that of Harriet Moon against the Home Life Insurance Company upon two life insurance policies, each in the face amount of five thousand dollars, insuring the life of Charles Moon.

Each of these policies carried what is known as a double indemnity provision, providing that the company would pay to Harriet Moon, wife of the insured, an additional sum of five thousand dollars upon each policy in case death resulted solely from bodily injury caused by external means of an accidental and violent nature. The Home Life Insurance Company has made full settlement of the face amount of each of these policies, but has denied additional liability under the accidental death provisions. This action is to collect the accidental death benefits of these two policies, a total of ten thousand dollars, from the Home Life Insurance Company.

The second action was by Harriet Moon against the Mutual Benefit Health & Accident Association upon a straight accident insurance policy, in which that company agreed to pay her the sum of five thousand dollars in the event of the death of the insured, Charles Moon, resulting directly and independently of all other causes from bodily injuries sustained through purely accidental means.

All three insurance policies involved in the two civil actions contained a provision to the effect that there should be no liability upon the insurer in case the death of the insured resulted from self destruction or suicide, whether the insured was sane or insane.

After the appellee had introduced all her evidence and rested her case, and again after all of the evidence was in and all parties had rested, the appellants moved the trial judge to direct the jury to return a verdict in their favor. The jury having returned a verdict in favor of the appellee and against both of the appellants for the full amount sued for, appellants moved the court to enter judgment in their favor notwithstanding the verdict or, in the alternative, to set aside the verdict and grant a new trial. All of these motions were by the trial court overruled, and exceptions were by the appellants duly taken.

There is very little dispute as to the evidence in this case, though there is wide divergence of opinion as to the proper inferences, both great and small, to be drawn from this evidence. About many features of the case there seems to be no controversy, and for the purposes of this case, we may take as true the statements contained in the remainder of this paragraph. The policies sued on were in full force and effect at the time of insured's death, early

in the morning of Monday, July 11, 1938, in the lily pool of his residence. Drowning was the immediate cause of insured's death; there was nothing whatever that might even suggest poison or murder.

"The only issue for you to determine", so the jury was instructed by the trial judge, "from the evidence is whether the insured, Charles C. Moon, came to his death by accident or suicide." The jury duly found that this death was due to accident, and judgment was entered in favor of plaintiff-appellee and against defendants-appellants. We are called on to decide, then, a single question: whether there was substantial evidence to justify the trial judge in submitting this question to the jury and to sustain the jury's verdict that the death of insured was due to accident, which would warrant the judgment for appellee, and not to suicide, which would call for judgment in favor of appellants.

■ Counsel for both sides appear to agree that the insurance policies herein sued upon were West Virginia contracts and that (under Erie Railway Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487) the substantive law of West Virginia should govern. Many cases are cited as to the burden of proof, or the duty of going forward with the evidence, or presumptions, as to death by accident or suicide. See particularly the West Virginia cases, Martin v. Mutual Life Ins. Co., 106 W.Va. 533, 146 S.E. 53; Goodbar v. Western & Southern Life Ins. Co., 89 W.Va. 221, 108 S.E. 896; Beckley Nat. Exch. Bank v. Provident Life & Acc. Co., W.Va., 2 S.E.2d 256; McDaniel v. Metropolitan Life Ins. Co., 119 W.Va. 650, 195 S.E. 597; Beard v. Indemnity Ins. Co., 65 W.Va. 283, 64 S.E. 119. And see (all decided by this Circuit Court of Appeals): Tabor v. Mutual Life Ins. Co., 13 F.2d 765; Jefferson Standard Life Ins. Co. v. Clemmer, 79 F.2d 724; Travelers Indemnity Co. v. Plymouth B. & P. Co., 99 F.2d 218; American Nat. Ins. Co. v. Belch, 100 F.2d 48. Under these cases, and under Rule 50 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, when we believe that the evidence justifies only one reasonable inference—that the insured's death was due to suicide, then we should remand the case to the District Court with directions to set aside the judgments in favor of the plaintiff-appellee and to enter judgment (in each civil action) in favor of the defendant-appellant. We do so believe, and we do so direct.

■ At least a brief review of the events leading up to the tragedy, together with some comment on the circumstances shown in connection with the finding of the body of the insured in the lily pool, would seem to be in order. When these are pieced together and dispassionately analyzed, in the light of their background, only one hypothesis—that insured met death by suicide —seems to square with the sane dictates of reason.

For some months previous to his death, insured had been in a rather desperate financial condition which, apparently, had been steadily growing worse. Insured for about ten years had been employed by the Koppers Coal Company at a salary of $450 per month (reduced during his last year with the company to $405 per month), from which he was discharged due to the depression and his "increasing inattention to duties" as of February 28, 1938, though his salary for March and April, 1938, was paid. He had borrowed all he could on his insurance policies. Only a few days before his death, insured's application for a loan had been denied by his former employer. On the day of his death, his bank balance was four cents. Many checks of insured, cashed for him by his friends, had been returned by the bank, unpaid for lack of sufficient funds. There was evidence that insured had secured some kind of agency to sell dictaphones and some type of income certificates; yet the record is silent as to the receipt of any income by him, since his discharge by the Koppers Company, from these sources.

Insured's relations with his wife had certainly been strained for some time. On Saturday evening (insured died early Monday morning), insured and his wife had a serious quarrel, when the wife belittled him to others, and insured over his wife's protest left the house angry, though she followed him "clear out to the street" for the purpose of getting "him out of the mood he was in". He remained away from home, spending part of the time in a gambling-house, until early on the fateful morning of his death. About five o'clock Monday morning, insured returned to his home. He found the door locked by a chain; so he had to use the knocker and was admitted by his eleven year old son, Jackie. They did not speak. Jackie returned to the bedroom occupied by him and his mother (wife

of insured). Alone, insured went up to this bed-room and, though both Jackie and Mrs. Moon were awake and though insured took off his hat and sat down in the room, again not a word was spoken to him. She testified that Jackie told her not to "say one word to Daddy. If you do, you all will get into a fuss." But as insured knew nothing of this conversation, certainly his reception must have appeared to him anything but cordial; so insured left the room and house, never to be seen again alive.

This brings us to probably the strongest link in the chain of evidence in favor of the suicide theory—the suicide note. This note reads:

"7/9/38
"Harriet—

"I've heard your estimate of me to others. Of course, a man can't get a long way with that kind of publicity from his wife. You've made it impossible for me to go on. I hope and trust you'll be happy with me out of the way. But Please try to be a wife, instead of a nag, to your next husband. Don't drive him to desperation, too.

"You'd better destroy this note for anything that happens to me must be an accident. Remember That! It'll make a lot of difference in your insurance. That ought to keep you quiet for money means more to you than anything else, and the knowledge of this note would mean that you would collect about $5,000.00 less insurance. $5,000.00 ought to keep your mouth shut, but it's up to you.

"I'm sorry. We could have been happy together, if only you could have been a little more cooperative instead of so commanding and domineering. But the last straw was when I heard you belittling me to your friends.

"I've loved you, Harriet, all along, but you've made it impossible for me to go on. Again I hope you'll be happy now. C. C."

The date on the note, together with other evidence, indicated that the note was written on Saturday. But it was evidently not left by the insured in the downstairs front room until Monday morning: There were a number of people in that room on Sunday, when no note was seen by anyone, but the note was quickly found by Jackie on Monday morning when he (for the second time that morning) went down stairs about eight-thirty. He handed the note to his mother, whose reactions were somewhat strange. She first though of destroying the note unread, but Jackie influenced her to read it. She was upset by the note and cried. She looked for a match with which to burn the note but, finding no match, she tore the note into bits and threw these bits into a garbage sack in the kitchen. Later she turned these bits over to the Coroner, so that they had to be pieced together in order to be read. Apparently she made no efforts to learn of her husband's whereabouts or his fate. It was not until about four o'clock that same afternoon, when, going to the lily pool in the yard for another purpose, she found his body in the pool, that his death became known.

This pool (directly back of the residence) was 85½ inches long, 57 inches wide and 22½ inches deep. When the body was found, not quite completely submerged, the level of the water was less than 16 inches. The body was lying with the head at the northern end of the pool and the feet near the southern end, with the face turned upward, one arm in a horizontal position by the side of the body and the other arm across the chest. There were few, if any, signs of any disturbance of the flowers in the pool, no signs of any struggle or effort to save himself on insured's part. His hat was floating on the surface of the pool. In the pool, quite near its northeastern corner and very close to insured's head was a sealed drain pipe (on which blood was found) protruding about 3 inches from the bottom of the pool. Near the southwestern corner, in the pool, were portable concrete steps, while a fresh concrete chip (apparently broken from these steps) was found on the western wall of the pool. A police officer testified that these steps were unstable and loose; that he stood on these steps and that they turned over. What appeared to be blood (no test was made) had settled in the bottom of the pool. Through a crack in the concrete of the pool there was some leakage. On the ground, about one foot from the western side of the pool was found a whiskey bottle containing a very small amount of whiskey; this bottle was perfectly clean, which would seemingly indicate that it had been there only a short while.

Over insured's left eye was a shallow cut, while on the back of the head was a gash, about two and one-half inches long, extending from the crown of the head towards the left ear. This gash extended to the skull, but there was no fracture of the skull. According to the medical testimony,

this gash "was of itself sufficient to cause unconsciousness". A great deal was made by counsel for appellee of this gash, and of its probable effect of rendering insured unconscious, as strongly supporting the theory of accidental death. No one (as far as the record discloses) saw insured alive after he left his wife and son in the bed room; no one saw the body until it was found by appellee. The Coroner seemed to think insured had probably met his death between five and six o'clock in the morning.

Against all this picture appellee's counsel strove manfully (but we think quite unsuccessfully) to minimize the seriousness of the break between appellee and insured and to show that insured's financial condition was far from desperate. To offset the suicide note (in our opinion by far the strongest piece of evidence against the hypothesis of death by accident), appellee testified that at some earlier time insured had written a somewhat similar note, so that his last note was (to quote appellee's brief) "a mere 'scare' note written to frighten his wife". Appellee's testimony as to the first note was both uncertain and unsatisfactory. Literally and figuratively, this second note (we believe) was written when insured was in dead earnest.

A neighbor testified that she had many times seen insured out at the pool in the morning between seven and eight o'clock but, though she was often up around five-thirty o'clock, she had never seen him at the pool before seven o'clock. There was testimony that insured was seen, at various times between his leaving home Saturday evening and his return there early Monday morning, drinking and gambling, and that he ate breakfast at the Florentine Cafe about four-thirty o'clock Monday morning. Some evidence, too, was introduced to show that insured did not (save at the time of the quarrel with his wife on Saturday evening) appear to be in depressed spirits.

Appellee's contention as to the manner in which the insured met his death is thus set forth: "Moon started to get into his own bed in his own room in his own house about 5:00 A. M. on Monday morning; he probably thought of the leakage in the fish pond, or felt that he did not want to go to bed yet; thought perhaps that he had best wait up until his wife was awake, as he could not then tell if she were awake or asleep. At any rate he went to the fish pond, for his body was found there later

that day. Three or four days earlier he and his wife had argued about the location of some cattails in the fish pond, and he had stated that he wished to move them and would do so when he got time. It is reasonable to assume that he saw these cattails. * * * Moon stepped out on the concrete step in the pool, it turned, he lost his balance, and he fell into the pool, striking his head on the side of the pool as he went down, which blow caused unconsciousness and in his unconscious condition he slid down under the water and drowned." We should like to agree with this picture; but it does not square with the evidence.

Though the testimony on that score is not altogether clear, it seems more probable that the insured, during the short time he spent in the bed-room that fateful Monday morning, knew that his wife was awake, and that he made no move to go to bed. In his mental condition, it takes a vivid imagination to see him at that hour of the morning thinking of the cattails in the pool and the most aesthetic manner of arranging them. That gash on the back of insured's head and the broken chip from the concrete step do make it more difficult to determine the precise manner of insured's death. It is highly probable that he did go into the pool by means of these steps and that he did strike his head either on the pipe or on the concrete wall around the pool; but he did not fall into the pool accidentally. He went into the pool deliberately for the purpose of ending his life. The method of his exit from life was certainly unusual, but the instances are legion of one determined to die seeking strange or bizarre methods of encompassing death.

In this connection, too, it should be remembered that, for the purpose of a complete realization on his policies, the insured desired this death to appear accidental and wrote in the suicide note that his death must appear to be accidental: "You'd better destroy this note for anything that happens must be an accident. Remember That! It'll make a lot of difference in your insurance." He clearly appreciated what an effective piece of evidence against the theory of accidental death this note would be, since in the note itself he directed his wife to destroy the note. He had, the day before his death, sent cash to one bank to cover a check he had drawn to pay a premium on one of his policies. So he well might have planned his unusual manner of death in order that it might seem to be ac-

cidental. Having in the note instructed his wife as to the role she must play in the tragedy, he must needs set the stage as effectively as he could so that he might seem (to use a well known theatrical expression) to make his mortal exit in character. There was no evidence to show insured was under the influence of liquor that morning, but the whiskey bottle by the pool suggests that, after his decision was made, he nerved himself for the carrying out of his plan and hoped to minimize whatever agonies this might entail by a generous drink (or several generous drinks) of whiskey. The position of the body in the pool, and the absence of any real disturbance of the flowers therein, lend color to the assumption that insured's end was peaceful.

The judgment of the District Court, in each of the two civil actions herein involved, will be reversed and the cases remanded with directions to enter judgment in favor of the defendant (appellant).

Reversed.