DORA P. LAMBERT *v.* METROPOLITAN LIFE INSURANCE COMPANY.

(No. 9202)

Submitted September 10, 1941. Decided October 14, 1941.

548

*Harriett L. French,* for plaintiff in error.
*Sanders & Day* and *Walter G. Burton,* for defendant in error.

Fox, Judge:

This case comes to us on a writ of error to a judgment of the Circuit Court of Mercer County, in an action on an accident insurance policy, in which Dora P. Lambert was plaintiff, and the Metropolitan Life Insurance Company defendant. The insured was Lloyd L. Lambert, and Dora P. Lambert, his wife, was the named beneficiary. The policy provided for the payment of $5,000.00 in case of death "caused directly and independently of all other causes by violent and accidental means", and also contained a provision that "This insurance shall not cover suicide or any attempt thereat while sane or insane." Lloyd L. Lambert died of a gun shot wound on January 15, 1940.

The declaration filed follows closely the form prescribed by statute, (Code, 56-4-17), and the policy sued

on was referred to in the declaration and filed therewith. The defendant filed its plea denying the liability asserted against it, and also filed its specification of defense, wherein it set up the policy provision with respect to suicide and continued, "The defendant says that Lloyd L. Lambert, the insured, committed suicide on the 15th day of January, 1940." On the issues so made, the case was tried by a jury, and a verdict for the plaintiff for the face of the policy returned, on which, after a motion to set aside was overruled, the court entered judgment, and an exception to such action taken at the time.

The first question presented is that of the burden of proof, having in mind the affirmative defense of suicide set up in the specification of defense. The rule is that in a suit or action on an accident policy, or a double indemnity clause covering accident in a life insurance policy, the burden is on the insured to establish a *prime facie* case of accident before recovery can be had. *Ryan* v. *Metropolitan Life Ins. Co.,* 206 Minn. 562, 289 N. W. 557; *Jefferson Standard Life Ins. Co.* v. *Clemmer,* 79 Fed. (2d) 724, 103 A. L. R. 171; *Travelers Ins. Co.* v. *Wilkes,* 76 Fed. (2d) 701; *Scales* v. *Prudential Ins. Co.,* 109 Fed. (2d) 119; *New York Life Ins. Co.* v. *Gamer,* 303 U. S. 161, 58 S. Ct. 500, 82 L. Ed. 726, 114 A. L. R. 1218, 20 Amer. Juris. 138, 142; *Martin* v. *Mutual Life Ins. Co.,* 106 W. Va. 533, 146 S. E. 53. The rule is different where recovery is sought on a life insurance policy, and an excepted risk is sought to be established. There the burden of establishing the exception rests on the insurer. *Goodbar* v. *Western & Southern Life Ins. Co.,* 89 W. Va. 221, 108 S. E. 896; *McDaniel* v. *Metropolitan Life Ins. Co.,* 119 W. Va. 650, 195 S. E. 597. Does the fact that, in the case at bar, the affirmative defense of suicide is made, shift the burden of proof? In the first place, but for the statute (Code, 56-4-21), the insurer could have offered evidence of suicide under its plea of no liability; and the statutory requirement of specific statement of defense, if arising out of the policy, being for the benefit of the insured, should not be permitted to operate to the prejudice of the insurer; and, secondly, the Federal cases seem to hold, uniformly, that

the burden does not shift in such circumstances. *Travelers Ins. Co.* v. *Wilkes, supra; Jefferson Standard Life Ins. Co.* v. *Clemmer, supra; New York Life Ins. Co.* v. *Gamer, supra.* In the case last cited the Court said:

> "Under the contract in the case now before us, double indemnity is payable only on proof of death by accident as there defined. The burden was on the plaintiff to allege and by a preponderance of the evidence to prove that fact. The complaint alleged accident and negatived self-destruction. The answer denied accident and alleged suicide. Plaintiff's negation of self-destruction taken with defendant's allegation of suicide served to narrow the possible field of controversy. Only the issue of accidental death vel non remained. The question of fact to be tried was precisely the same as if plaintiff merely alleged accidental death and defendant interposed denial without more."

And in the *Wilkes* case it was stated:

> "Defendant's denial, in action on accident insurance policy, that insured's death was accidental, was sufficient plea, and additional plea of suicide added no defensive merit, but was merely denial that death was of sort insured against, so that burden remained on plaintiff to prove accidental death."

These statements find support in *Ryan* v. *Insurance Co., supra,* and *Scales* v. *Insurance Co., supra,* and there is nothing in our decisions, or the practice of our courts in conflict therewith. We therefore conclude that the burden of showing accidental death remained with the plaintiff at every stage of the trial, and that a showing of facts and circumstances from which a reasonable mind could infer accident was vital to any recovery, independent of any presumption against suicide.

The next question to be considered is the effect to be given to the legal presumption against suicide. In *Beckley National Exchange Bank* v. *Provident Life & Accident Ins. Co.,* 121 W. Va. 152, 2 S. E. (2d) 256, we held:

"When death occurs from unexplained violent and external means, an accident may be presumed; but presumption is excluded when the cause of death is shown." In that case we qualified *Martin* v. *Insurance Co., supra,* wherein it was inferentially held that the presumption would be permitted to operate in all cases. In neither of these cases was suicide involved. In both, injuries alleged to result from violations of law were involved, but it is believed that the same presumption as to accident would apply in a case where suicide might be alleged. While there is a presumption against suicide, that presumption cannot have weight or influence against proven facts or evidence as to the cause of death. That is what our cases, in effect, hold. In the *Provident Life* case we said, "Here the cause of death was explained. There was no place for presumption; the case must be judged on the facts." In *McDaniel* v. *Insurance Co., supra,* we held:

> "While there is a presumption of law against suicide, such presumption is not evidence, and a showing of facts or circumstances which would warrant a jury in finding that death resulted from a suicidal act overcome such presumption, and requires a finding in the case by a jury or the court, independently thereof, upon evidence produced at the trial."

This holding is supported by *Jefferson Standard Life Ins. Co.* v. *Bentley,* 55 Ga. App. 272, 190 S. E. 50; *Gem City Life Ins. Co.* v. *Stripling,* 176 Ga. 288, 168 S. E. 20; *King* v. *New York Life Ins. Co.,* 28 Ga. App. 607, 112 S. E. 383; *Hawkins* v. *Industrial Com.,* 157 Minn. 33, 195 N. W. 766, 36 A. L. R. 394. The presumption against suicide is not evidence and does not regulate or change the burden of proof. *Travelers Ins. Co.* v. *Wilkes, supra; Jefferson Standard Life Ins. Co.* v. *Clemmer, supra; Watkins* v. *Prudential Ins. Co.,* 315 Pa. 497, 173 Atl. (Pa.) 644, 95 A. L. R. 869; *New York Life Ins. Co.* v. *Gamer, supra.* The facts surrounding Lambert's death—those tending to show accident and those supporting the theory of sui-

cide—were developed by the evidence, and when developed any presumptions should have been discarded, and the question at issue decided on the evidence alone. We think this position is clearly upheld by our own decisions, the decisions from other states, and in the Federal courts.

The plaintiff below carried the burden of showing by evidence facts and circumstances which would warrant a jury in finding that the death of the insured was the result of violent and accidental means. She was under the burden of showing, "Circumstances which, if not inconsistent with suicide, are at least consistent with theory of accident." *New York Life Ins. Co.* v. *Sparkman,* 101 Fed. (2d) 484. "Verdicts must rest on probabilities and not on mere possibilities." *New York Life Ins. Co.* v. *Trimble,* 69 Fed. (2d) 849. To the same effect are the holdings in *Equitable Life Assurance Society* v. *Guiou,* 86 Fed. (2d) 865, and *Agen* v. *Metropolitan Life Ins. Co.,* 105 Wis. 217, 80 N. W. 1020, 76 Am. St. Rep. 905.

We must now determine from the evidence whether she has sustained the burden of proof. The insured was a respected citizen of the City of Princeton and a trusted employee of a banking institution in that city. He lived in Princeton, about three-quarters of a mile from his place of employment. It was his custom to take his noon meal at his home, and to travel to and from his meals with a neighbor who worked with him in the bank. On the day of his death these customs were followed. After his noon meal he spent some half an hour in cleaning and oiling a rifle owned by him, which, ordinarily, he kept in a leather case in a closet in his home. The door of the closet opened from the front hall of his home, and to the right, and when open rested on the right wall of the closet. On this day he took the rifle from the closet, removed it from its case and laid the case on a chair in the hall. When his neighbor called on his return to work, Lambert hurriedly loaded the rifle and put it in the closet, but left the case on the chair in the hall where it remained during the afternoon. There is no evidence of what disposition he made of the rifle except that he put

it in the closet. It appears that in cleaning the rifle he used a cleaning rod. There is evidence that the gun was easy on trigger and that a hard blow on the stock or butt or a fall of two feet or more by which the stock would be jarred might cause the gun to fire, if loaded and cocked. There is no evidence as to whether the gun was or was not cocked. Nothing unusual happened at the house during the noon hour, and Lambert returned to his work in due course of daily conduct. He returned home about four o'clock in the afternoon, in circumstances to be hereafter detailed. At this time his wife was away from the house. His two small children were playing in the dining-room which adjoined the hall from which entry into the closet could be had. A housemaid was engaged about her work in the kitchen, which adjoined the dining-room. When Lambert entered the house he came into the hall, then through a living-room to the left of the hall, through a corner of the dining-room and to the right and back into the hall. While passing through the dining-room he inquired of the maid about the basement fire, but passed on and went into the closet where he had placed his rifle at noon. Immediately thereafter, according to the testimony of the maid, she heard the closet door open, or heard the door strike the wall against which it opened, and then immediately a shot followed by the groanings of the deceased. The maid is a little confused as to what she heard, whether the opening of the door, or its striking against the wall, but the confusion is not, as we view the whole case, of great importance. When the maid heard the shot she became frightened, took the children and left the house, giving an alarm as she departed. A group of people soon gathered, police officers and a physician were summoned. Lambert's body fully clothed and including his overcoat, was found within the closet, and lying on his right side, crescent-shaped, his feet in the direction of and near the door of the closet which was open, and resting near, if not against, the closet wall. The gun was lying by the door, one witness testifying that it was along the door its full length, while another thinks it lay partly along the door but that the stock or

butt extended into the hall as much as ten inches. The cleaning rod lay under the body. The gun was forty-two inches in length, and while there is no evidence as to the length of the cleaning rod, it is fair to assume that it was at least the length of the barrel of the gun. Lambert was dead when the first person, his father-in-law, reached him. The shot which caused his death entered his body on the left side about the second rib, ranged upward and inwardly above his heart, passed out of the body, and marks on the wall of the closet indicate that the bullet struck the wall at an elevation of about seven and one-half feet from the floor. The bullet hole where it entered the clothing and the body was small and larger at the point of exit. There were some powder burns around the edge of the bullet hole through the outer clothing— none on the body. There is no evidence even tending to show how the gun could have been accidently discharged. We do not know, and can never know where Lambert placed the gun in the closet. There is no explanation or even conjecture as to how the gun could have been accidently discharged. The maid heard nothing but the door and the discharge of the gun. If the gun had been cocked, and had fallen on its butt and thereby discharged, the maid would most likely have heard the fall of the gun, although it may be contended that the fall of the gun and its discharge, being instantaneous, the fall could not be distinguished from the discharge. Any explanation of this sad event on the theory of accident must be based on conjecture and possibilities. In our effort to understand the reasons which prompted the jury's verdict, we have, without success, endeavored to find some reasonable basis on which the theory of accident could be founded.

The defendant's theory of the cause of death is likewise based upon conjecture of what the deceased might have done. It says that the deceased could easily have placed the muzzle of the gun against his side, placed the butt of the gun on the floor and against the door, used the cleaning rod to set off the trigger and discharge the gun, and that the rebound of the gun would cause the door to strike the side of the closet, and cause the noise

which the maid heard when the gun was discharged. The fact that the cleaning rod was separated from the gun and found under the body lends support to this explanation. There is nothing inherently impossible, or even improbable, about this theory, but, of course, there is no proof that the death of Lambert happened that way, and we can only conclude that it so happened by resort to conjecture, involving the exclusion of other possible explanations.

These being the facts and circumstances developed by the evidence, bearing upon events of the death, we prefer to base our conclusion on the failure of the plaintiff to make a showing on which, from any reasonable consideration of the evidence, a jury could have found that death resulted from an accident. The burden was upon her to do so, and in this she has failed. Until she sustained this burden, she was not entitled to recover, and the defendant was not called upon to make a showing of suicide as an affirmative defense. Only in case of a *prima facie* showing of accidental death was the defendant called upon to make a showing of suicide or other defense barring recovery.

But it is contended that there has been a showing of violent death; that the law presumes that the insured did not commit suicide; and, therefore, it follows, inevitably, that death must, in the circumstances, have resulted from accident. This is a strong position, and but for other evidence and circumstances, now to be detailed, might impel us to uphold the judgment of the trial court. It appears from the evidence that Lambert was head teller in the banking institution which employed him, and was responsible for all cash in its possession. The bank was usually closed to the public at 2:30 p. m., but the day of Lambert's death was pay day for the Virginian Railway, and it was customary to again open the bank on pay days at 4:30 p. m. for the accommodation of employees of the railway company. The insured knew of this custom, and knew this would be an unusual and busy day, particularly for tellers who would be expected to receive deposits or cash checks. The bank closed at the usual time, and

shortly thereafter bank examiners, representing the State and Federal Governments, appeared on the scene, and immediately began an examination of the bank. One of the first, if not the first, of the processes in such an examination was to count and check the cash, a matter of particular importance to the one man responsible therefor. Very soon thereafter, and before the examiners reached his cage, Lambert left the bank, telling some one that he had been called home, and stating to another employee, "I am called home right in the busiest time," and also "Trouble right in the busiest time would happen." It clearly appears from the evidence that he had not been called home, and it does not appear from the evidence that there was any trouble requiring his presence at his home. Within a short time news of his death reached the bank, whereupon an examination of his accounts was made, which disclosed a shortage of approximately $7,500.00. In an effort to show that Lambert may not have been morally responsible for this shortage, evidence was introduced tending to show that there had been some carelessness in handling cash in the vault of the bank, but the fact remains that the shortage existed, and Lambert was the one person to whom the bank would look for an accounting. In fairness to a man who cannot now speak for himself, it should be said that the record does not show any specific acts of theft or embezzlement on the part of Lambert, and his accounts were checked as late as July, 1939, about six months before his death, and no shortage found. On the other hand it appears from the evidence that there are many ways of covering defalcations which ordinary checkings would not uncover.

Whatever may be the facts respecting this shortage, it appears certain that Lambert must have known of its existence, and likewise knew that the advent of the examiners might and probably would uncover it. He then fabricated an excuse and left the bank, and within thirty minutes was dead. Whether he died by his own hand we do not know, but human experience teaches us that in similar circumstances men take their own lives. The facts of the shortage and the death which followed

cannot be escaped. They blaze forth like a beacon light in the darkness, and cannot be hidden. They furnish motive and probability for the tragic sequence, and, in our opinion, if they do nothing more, serve to destroy every vestige of presumption against suicide, and leave naked and unsupported the mere fact of violent death without any presumption of accident in connection therewith. Such a showing is insufficient to support the verdict returned in this case, and, on the record made, the trial court should have directed a verdict for the defendant.

It may be said that the attitude and demeanor of Lambert immediately before his death, and the very manner of his death argue against the theory of self-destruction. It must be remembered that not only the policy sued on, but three other policies of like amount carried by him had provisions for payments dependent on a showing of accidental death. If he designedly took his life, he would, in the circumstances, naturally seek to create the appearance of accident.

We are not unmindful of numerous cases, decided by courts of last resort, in which they have held the question of accident or suicide to be one for jury decision. Many of these cases are cited by counsel for the plaintiff, and, if followed by us, might justify us in sustaining the judgment of the trial court. But we approve the statement of Judge Soper, when, in *Jefferson Standard Life Ins. Co.* v. *Clemmer, supra,* he said:

> "The result has been in many cases of self-destruction to be found in the books, that judge and jury alike have been unable to take a common sense view of the facts of life, and have seemed to be the only persons in the community who did not clearly understand what had taken place."

And, when we say that, on the evidence presented, the plaintiff was not entitled to recover, we think we are in line with the modern trend of authority which, apparently, seeks to escape from the extremes to which courts had been led in cases of this character.

Centuries ago the question was asked: "What is truth?" The question has never received a satisfactory answer. In all ages men have sought after truth, and much of our effort to judge between men in the affairs of life is but another method of seeking it. Cases like the one at bar perplex and confuse us, and, in their determination, we can never be certain that we have found the truth. We can only be guided by accepted rules of law, and the experiences of the ages in dealing with similar questions, and with the frailities and weaknesses of human kind. So guided, we are, under the evidence in the case at bar, impelled to the conclusion that the jury should have found that Lloyd L. Lambert died by his own hand. The verdict returned was necessarily based on a finding of accidental death, and should have been set aside as contrary to the law and the evidence.

The judgment of the Circuit Court of Mercer County is reversed, the verdict of the jury set aside, and a new trial awarded.

*Reversed and remanded.*

KENNA, PRESIDENT, dissenting:

With every deference, I do not regard the question of fact here involved as being doubtful enough to lead this Court into the intricacies involved in the holdings of the decided cases dealing with the question of suicide and the practical application of the generally upheld presumption against its occurrence. This Court, by virtue of the discussion of that presumption in the very thorough opinion of *McDaniel* v. *Insurance Company*, 119 W. Va. 650, 195 S. E. 597, has approved the view that it is a legal presumption operative only upon the trial judge, unless it may be said through him to operate indirectly upon the jury. Under that rule, it has no effect upon jury considerations, but it may control the determination of the trial judge in directing the jury's finding. See in addition, 9 Wigmore on Evidence (3rd Ed.), page 288, Par. 2491. As to presumptions as evidence, see the note in 95

A. L. R. 876, 887, and as to the specific presumption against suicide as evidence, see 103 A. L. R. 185.

It is quite likely, however, that a precise application of the presumption against suicide in this matter would still favor the plaintiff's position. Treating the presumption against suicide as a question of law that does not reach the jury and, therefore, in passing upon an issue of fact, cannot be accorded probative effect, we should not lose sight of the fact that the majority opinion here is not dealing with a quiescent presumption against suicide as with the case before the jury, but in holding that a verdict should have been directed in favor of the defendant, it is placing the case in a position where its decision is directly controlled by a legal finding and where, with the case away from the jury, the dormant presumption against suicide has its effectiveness revived. The majority says that the defendant is entitled to a verdict as a matter of law, and in arriving at that conclusion must find that defendant's proof clearly outweighs the presumption against suicide. The court's opinion is dealing with a finding of law by the court; not a finding of fact by the jury. I do not think that it is necessary to approach this matter from that angle, however. To the contrary, though the *Martin* case (106 W. Va. 533), hereinafter cited, indicates clearly that this Court does not adhere to it, I believe that the plaintiff here can even concede the principle spoken of in 8 Couch on Insurance, 7248, to the effect that in jurisdictions where the distinction is drawn between accident policies and life insurance policies to the end that in the former, as a part of the plaintiff's affirmative showing, it becomes necessary to negative suicide. In speaking of suicide and the circumstances under which its happening becomes a question of law for the court, and those under it must be submitted to the jury, 6 Couch on Insurance, 4660, has this to say: "Generally speaking, the rule is that if the evidence is so clear and convincing that it can be said that all reasonable men would draw the same conclusion therefrom, then the question is one for the court; in other words, where the evidence produced clearly overcomes the presumption against suicide, con-

vincingly indicates suicide, and is inconsistent with any other hypothesis than that of self-destruction, the insurer is entitled to a directed verdict on the defense of suicide." As stating that a physical injury gives rise to the presumption of accident, and not to self-infliction nor to the act of a third person, see 5 Couch on Insurance, 3992.

The *Martin* case, as I read it, holds that upon a showing of violent death a *prima facie* presumption of accident arises. I see nothing in *Beckley, etc., Bank v. Insurance Co.*, 121 W. Va. 152, 2 S. E. 2d 256, to change that rule, the difference between the two cases being that the latter held that the victim's beneficiary could not treat as accidental a death which was plainly shown to have resulted from resisting the victim's brutal assault, whereas the *Martin* case held that the showing that death resulted from self-defense did not overcome the presumption of accident. I quote the opinion in the *Martin* case:

"The plaintiff made out a *prima facie* case when she introduced proof establishing the death of Martin by external and violent means. 1 C. J., p. 495, sec. 278; *Fidelity & Casualty Co. v. Weise,* 80 Ill. App. 499; *Whitlatch v. Fidelity & Casualty Co.,* 24 N. Y. Supp. 537; note on page 919, Vol. 9, Ann. Cas.; *Nerrow v. Pac. Mut. L. Ins. Co.,* 294 S. W. (Mo.) 97. The proof of death by such means raised a presumption that the insured's death was accidental, and this presumption was not destroyed by the fact that her evidence showed that Martin was 'killed' by Doctor Brannon. *Gilkey v. Sovereign Camp of Woodmen of the World,* 178 S. W. (Mo.) 875, 877. It then became incumbent upon the defendant insurance company to meet this *prima facie* case by affirmatively showing that the deceased came to his death as a result of a violation of law. *Sovereign Camp of Woodmen of the World v. Jackson,* 138 S. W. (Tex.) 1137; *Gilkey v. Sovereign Camp of Woodmen of the World, supra;* 14 R. C. L., sec. 599, p. 1437; *Fidelity & Casualty Co. v. Weise, supra;* and authorities cited *supra.* Can it be said as a matter of law that under the evidence introduced in this case the defendant insurance company has carried that burden?"

When the presumption of accident arises upon the showing of violence where recovery is sought under the double indemnity clause of a life insurance policy, as in the *Martin* case, I see no reason for changing the rule when recovery is sought under an accident policy. Certainly death may be shown to have resulted from violent and accidental means without negativing suicide by actual proof to the satisfaction of the court, the added presumption against suicide calling upon the court to require the defendant to adduce proof of that fact in order to avoid a binding instruction on that question.

It seems to me quite apparent that this is the type of case that cannot be disposed of under general principles of law, the backbone of the matter being largely factual where the decided cases cannot be greatly helpful.

As illustrating the conclusive showing favoring the defendant that is required to establish a suicidal defense, see the cases cited in the annotation in 37 A. L. R. 171.

As holding, in a similar case where death was due to a gunshot, that the cause of death should properly be left to the jury, see *New York Life Ins. Co.* v. *Gamer,* 303 U. S. 161, 171, 58 S. Ct. 500, 82 L. Ed. 726, 114 A. L. R. 1218.

In *Goodbar* v. *Life Ins. Co.,* 89 W. Va. 221, 226, 108 S. E. 896, 898, as to the attitude of this Court concerning proof of suicide, we had this to say: "The tenacity with which men cling to life is so great that suicide will not be presumed (?) unless the state of facts under which death occurred practically excludes every other reasonable hypothesis, and the court so instructed the jury in this case." (My question mark).

As establishing the rule in West Virginia that the plaintiff, in order to recover under the double indemnity provision of a life insurance policy for death resulting from external, violent and accidental means, is not required to negative the express exception of death resulting from a violation of the law, which is matter of defense to be alleged and shown by the defendant, see *Martin* v. *Ins. Co.,* 106 W. Va. 533, 146 S. E. 53.

But as I have said, conceding that the presumption against suicide does not reach the jury and influence

their finding of fact, and even granting that the plaintiff, seeking to recover on an accident policy, must negative suicide by its proof, I am still of the opinion that upon this record, a verdict for the plaintiff should not be disturbed as a matter of law. With the exception of evidence of an unaccounted for shortage, the testimony on the part of the insurer impresses me as being conjectural and far short of the direct or convincing circumstantial proof required to establish suicide. It is true that in some strange way the decedent might have contrived an unrevealed, ingenious manner of killing himself so that his high-power rifle would have been propped to be fired into his back eight inches below and to the right of the point that the bullet left his body after passing through his heart: he could have used the straight ramrod with no strings attached to it to press a piece of metal as small as the trigger, two feet or more behind him and out of his normal line of vision: he could have preferred death by suicide to explaining a shortage in that part of the bank's accounts of which he had charge. A finding of suicide on the part of the jury would have entailed those conclusions. A verdict based upon that finding would, perhaps, be maintainable. On the other hand, it is quite likely that the jury took the viewpoint that they were justified in concluding that whatever is not reasonably accounted for may be treated as having happened accidentally, and that being so, and it being apparent that the death of the insured was caused by violent and external means, good conscience required a verdict for the plaintiff.

I am strongly convinced that the circumstances indicating suicide, while likely of enough weight to prevent the presumption against it from resulting in a directed verdict for the plaintiff, fell far short of the clarity and preponderance which alone would justify a directed verdict for the defendant.

Judge Lovins authorizes me to say that he concurs in this opinion.