O'NEILL U. TOWER *v.* THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

(No. 9448)

Submitted April 7, 1943. Decided April 27, 1943.

Lovins, Judge, and Riley, President, dissenting.

*Grover F. Hedges* and *M. O. Litz,* for plaintiff in error.
*Brown, Jackson & Knight* and *W. T. O'Farrell,* for defendant in error.

Rose, Judge:

This case is here on writ of error to the judgment of the Circuit Court of Roane County entered upon a verdict directed by the court, in favor of the defendant.

The action was based upon a policy of insurance issued by the defendant under date of February 7, 1931, in the amount of three thousand dollars ($3,000.00), on the life of Robert N. Tower, with the further agreement "to increase the amount so payable to six thousand dollars ($6,000.00) in event of the Insured's death from accident, as defined in the Double Indemnity provision on the fourth page thereof, subject to the conditions therein set forth". The "Double Indemnity" provision reads as follows:

"Upon receipt of due proof of the Insured's death from accident as defined below, occurring while this policy was in force and no premium hereunder in default, the Society agrees to increase the face amount to the amount stated on the first page hereof.

"Death from accident means death resulting solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means and ensuing within 90 days of such injuries, but does not include death resulting from or caused directly or indirectly by self-destruction sane or insane, the taking of any poison or the inhaling of any gas, whether voluntary or otherwise, disease or illness of any kind, physical or mental infirmity, military or naval service in time of war, riding as a passenger or otherwise in an airplane or in any other type of aircraft, or by the Insured's violation of any law."

The defendant admitted liability for the primary death benefit of three thousand dollars and paid into court this sum, less a small loan, but defended against the claim based on alleged accidental death by denial that the assured's death was accidental as defined in the policy, and by specifying the affirmative defense that the death was by suicide.

The plaintiff on the trial introduced ten witnesses by whom the circumstances and surroundings of the assured's death were portrayed in elaborate detail, and then rested her case. On motion of the defendant, the court then struck out all the plaintiff's evidence and directed the jury to return a verdict for the defendant. This action of the court is the only error assigned for reversal.

The plaintiff asserts that, at the time the verdict was directed against her, there was a presumption against suicide by the assured which should have preserved her case for submission to the jury, while the defendant relies upon the theory that, with the facts relating to the as-

sured's death fully developed in evidence, such presumption became inoperative. This Court is committed to the latter rule. In *Lambert* v. *Metropolitan Life Insurance Company,* 123 W. Va. 547, 17 S. E. (2d) 628, 629, we announced that,

> "Where the facts surrounding an injury or death have been developed by evidence, any question as to liability arising therefrom must be determined from the evidence, unaided by presumptions other than those arising from the evidence introduced.
>
> "In a suit or action to recover on an accident insurance policy, on account of the death of the insured, the presumption of law against suicide, does not, in a case where the facts connected with the death are shown by the evidence, relieve the plaintiff of the burden of showing facts and circumstances from which accidental death may be established or reasonably inferred."

This view has the support of late cases from many jurisdictions. *Abbott* v. *Metropolitan Life Ins. Co.,* 282 Mich. 433, 276 N. W. 506; *Del Vecchio* v. *Bowers,* 296 U. S. 280, 56 S. Ct. 190, 80 L. Ed. 229; *Jefferson Standard Life Ins. Co.* v. *Clemmer,* 79 Fed. (2d) 724 (CCA 4th), 103 A. L. R. 171; *Travelers' Ins. Co.* v. *Wilkes,* 76 Fed. (2d) 701 (CCA 5th); *Jefferson Standard Life Ins. Co.* v. *Bentley,* 55 Ga. App. 272, 190 S. E. 50; *New Amsterdam Cas. Co.* v. *Breschini,* 64 Fed. (2d) 887 (CCA 9th); *Mutual Life Ins. Co. of N. Y.* v. *Johnson,* 122 Fla. 567, 166 So. 442; *Frankel* v. *New York Life Ins. Co.,* 51 Fed. (2d) 933 (CCA 10th); *Equitable Life Assur. Soc. of the U. S.* v. *Halliburton,* 67 Fed. (2d) 854 (CCA 10th); *Watkins* v. *Prudential Ins. Co.,* 315 Pa. 497, 173 A. 644, 95 A. L. R. 869; *Griffith* v. *Continental Casualty Co.,* 299 Mo. 426, 253 S. W. 1043; *Modern Woodmen of America* v. *Kincheloe,* (Ind.) 93 N. E. 452; *New York Life Ins. Co.* v. *King,* 28 Ga. App. 607, 112 S. E. 383; *Woodmen of World* v. *Alexander,* (Tex. Civ. App.) 239 S. W. 343.

"The presumption (against suicide) operates to its fullest extent only where there is no proof as to whether the death was accidental or suicidal. It disappears, or at least does not prevail, where the proof shows the manner of death or points to suicide, or where the circumstances are wholly inconsistent with any hypothesis of accidental death, or where the proof leaves no room for any reasonable hypothesis but suicide." 31 C. J. S. Evidence, sec. 135, pp. 775, 776.

We discover no reason for departing from the conclusion which we reached in the *Lambert* case. But to apply the rules there established, we must summarize in some detail the evidence.

The plaintiff is the beneficiary in the policy and the widow of the decedent, Robert N. Tower, the assured, who met his death from a gunshot wound about 3:00 P. M. on the 31st day of December, 1941. The assured had been since December, 1935, resident manager of the Spencer Gas Company, which had its office in the City of Spencer. At the lunch hour on the day of his death he advised his wife that he planned to go, on the following day, to Nashville, Tennessee, to which place he expected to be transferred soon, and requested her to accompany him for the purpose of making acquaintance with some friends there. The husband remained in the living room reading the newspaper until after 2:30 P. M., when he came to the head of the stairs, where the wife was then working on a dress which she was to take on the trip, to report to her a telephone message. He then expressed the intention of going hunting the following day, before starting on the trip to Nashville. She suggested to him that he take with him a recoil pad which she had recently purchased for him, for the purpose of trying it out. The two then entered a small room spoken of as a wardrobe or storage room, which is described as being about 6 feet in width and 12 or 15 feet in length, and as separated from the main room by a partition. The entrance to this room was by a door at the side of the end of this room nearest

the stairway. Across this end of the room, and to the left of the door, was a piece of pipe on which clothing was hung, above which was a shelf. At the right of the door and distant from it about a foot and a half was a disconnected gas stove, directly across the room from which was a cardboard chest. Immediately over the stove a shotgun in its case was hanging from a nail, and on the same wall, distant about three and one-half feet from the stove, hung the decedent's hunting jacket with its front side facing the wall, its lower end being about three feet from the floor.

The plaintiff testifies that she and her husband entered this room together, after which he took the gun from the wall, removed it from its case, sat down on the stove, placed the case on the chest, and stood the gun with its butt on the floor in front of him with the barrel leaning toward him at about a forty-five degree angle. She then turned to the shelf for the purpose of getting the recoil pad which she had placed there. Two dogs were with them in the room, a beagle pup, playing about the man's feet and butt of the gun, and an eskimo dog, which was afraid of a gun, at the back end of the room. While in this position, with her back to the husband, she heard the mechanism by which shells are ejected from the gun, click three or four times. At this point she recalled that she had not disconnected the electric iron which she was using and, saying to her husband, "Wait a minute", left the room. As she went out she observed her husband still sitting on the stove with the butt of the gun to the right of his right foot and the barrel at an angle of about forty-five degrees (in which direction she does not say) while he was leaning to his right, reaching with his right hand toward the hunting jacket. When she had taken about two or three steps outside the door she heard the gun's discharge and her husband's cry of "Honey". She immediately rushed back into the room, meeting the eskimo dog fleeing therefrom. She found her husband lying at full length on his back on the floor, with his feet op-

posite the middle of the stove, his body parallel to the wall and his right hand above his head. He spoke nothing further, and his only movement was to bring his right arm down to his body. She raised his head and shoulders for a moment but, from his desperate breathing and the flow of blood, concluded that he was badly injured, and called the DePue Hospital by telephone. On returning, took her husband's head in her lap and so supported him until Doctor DePue and a nurse arrived. The nurse immediately took her to the room below and called an undertaking establishment for an ambulance which arrived promptly. The wounded man was carried downstairs, placed in the ambulance and hurried to the hospital, where he died in about ten minutes.

Doctor DePue testifies that when he and the nurse arrived, he immediately had the nurse take Mrs. Tower from the room and then proceeded to note minutely the surroundings before giving attention to the patient, in order to determine whether there was any evidence of foul play. Having satisfied himself of the negative, he cut open the clothing, observed the seriousness of the wounds, covered them in front and back by bandages, and had the patient taken immediately to the hospital. The doctor, the nurse, and the undertakers say that the shot entered the body from the front of the left side, about the position of the sixth and seventh ribs, which the doctor locates as being about one and one-half inches below the nipple and one inch to the left thereof. The shot passed through the body near to, but missing, the heart and emerged at a slightly higher point in the rear. The side of the chest was blown away excepting only a little skin extending from above the wound to the flesh below. The lower lobe of the left lung was entirely collapsed and the heart, visible through the wound, was still beating weakly or "fluttering", after the arrival at the hospital. The death was caused by hemorrhage and shock resulting from the gunshot wound.

Doctor DePue describes the position of the body in the

same manner as that given by the plaintiff. He adds, however, that the gun was lying at the patient's right side, with its muzzle about his shoulder and its butt opposite the stove. He removed the gun and placed it against the wall at the back end of the room. He also observed shot marks on the door casing at about the height of the victim's shoulder, assuming that he was sitting on the stove, and describes also the stove as being tilted back against the wall, the paper of which showed a mark apparently made by the scraping of the stove, as well as another mark on the floor as if scratched by the leg of the stove.

Two undertakers testify to the same condition of the body. One of them particularly describes the conditions as he found them in the room, mentioning the marks on the floor, those on the wall behind the stove, the shot marks on the door casing and adds that the door casing "split the shot", some of which passed out through the door opening and struck a chest in the outer room. The plaintiff also states that some of the shots struck this chest and expresses surprise that she, herself, was not hit, as she was near this position. Several witnesses testify also to a hole or dent in the cardboard chest, which the plaintiff says was not there before the accident. The shotgun, after its discharge, contained two shells, one loaded and the other discharged. The hunting jacket had receptacles for ten shells on either side, all except two of which were filled.

The shot reached the body through the pocket on the left hand side of the golf shirt which the assured wore. This pocket was large and bellows-like, having pleats in front and rear. The outside, or patch, of the pocket was not injured. The lower point of the flap, which was inside the pocket, was shot off. Doctor DePue testifies that there were powder marks on the shirt and slight powder marks for about one-eighth of an inch around the wound in the breast.

The gun from which the assured met his death was a

12-gauge hammerless, shotgun, with a safety device on the trigger guard, holding when loaded five shells in the magazine and one in the barrel, and operating with a sliding "pump" action. The barrel was 28 inches in length; the distance from breach to trigger, 5¼ inches; and the full length of gun 46¾ inches. On top of the muzzle end of the barrel was a sight or bead.

With the evidence standing thus, were there any facts, or any legitimate inference from facts, independent of the presumption against suicide, in the evidence proving or tending to prove, directly or indirectly, that the gun was discharged accidentally? The very utmost that is suggested by counsel is the mere possibility that the beagle pup playing about the gun might, or could, have discharged it. This is not sufficient. Plaintiff must do more than show that the death might, or could, have been caused by accident. On the other hand, there are certain definite facts which may be considered, at least in some degree, as militating against the theory of accidental death. The shot which killed the assured passed through the front of his shirt behind the patch forming the pocket, but not through the patch. It is argued, therefore, that the muzzle of the gun was in the pocket at the time of its discharge (a circumstance explained argumentatively by plaintiff's counsel by the suggestion that the front sight on the barrel of the gun might have caught in the outside part of the pocket and pulled it downward.) The shot passed through the assured's body in an almost horizontal course from front to rear, struck the door casing at a somewhat higher level, and the chest in the outer room. The course of the shot thus established indicates strongly that the barrel of the gun, if the assured remained in the position in which he was seen a second or two before the discharge, must have been in a like horizontal position and at approximately the height of his chest. No object, animate or inanimate, was near the gun, from below or at its side, by which it could have dis-

charged, except the assured himself. It could have been placed in this position by the assured and while in that position, the trigger could have been reached by his hand. This position of the gun, and its discharge while in this position can be explained only by the hypothesis of design and purpose of the assured. These facts, while not establishing suicide, beyond doubt, as in the *Lambert* case, are at least more consistent with voluntary self-destruction than with accidental death, and make out a prime facie case for the defendant.

No counter-balancing facts or circumstances are pointed out which tend to show any accidental manner in which this gun was (not might have been) actually discharged; none accounts for it on the theory of an accident. There is no showing of any fortuitous happening which could have placed the gun in its established position, or that could have discharged it in that position. The original presumption of accident disappeared upon the prima facie showing of suicide, and no evidence has been produced to fill the void thus created in plaintiff's case. In the case of *New York Life Ins. Co.* v. *Gamer*, 303 U. S. 161, 171, 58 S. Ct. 500, 503, 82 L. Ed. 726, 114 A. L. R. 1218, in a like situation, the court eliminated the presumption against suicide thus:

> "The evidence being sufficient to sustain a finding that the death was not due to accident, there was no foundation of fact for the application of the presumption; and the case stood for decision by the jury upon the evidence unaffected by the rule that from the fact of violent death, there being nothing to show the contrary, accidental death will be presumed. The presumption is not evidence and may not be given weight as evidence."

We are struck by the close parallel between these decisive facts in the present case and those commented on in the opinion in the case of *McDaniel* v. *Metropolitan Life Insurance Co.*, 119 W. Va. 650, 656, 195 S. E. 597, 600, where it is said:

"The claim that the death of the insured resulted from an accidental discharge of a pistol is, in our opinion, met by the physical facts which show that the bullet which caused his death entered the skull in the right temple, passed through his head and through a window of the room where the tragedy occurred in a direct line from the entrance wound to the hole in the window glass, showing conclusively that the pistol must have been fired at or near the head of the insured while he was in a standing position. There is no other reasonable explanation of these undisputed physical facts. It is impossible to conceive how such a wound could have been inflicted by the falling of the pistol to the floor, or the striking of any other object which would cause it to be fired. All presumptions give way to these facts, and they exclude any reasonable hypothesis that the death of the insured came about in any manner other than by his own intentional act."

The status of the case here must also be kept in mind. We are not the appraisers, in the first instance, of this evidence. That right and duty devolved upon the trial judge and the obligation was not perfunctory. A judge sitting in the trial of a jury case is not a mere automaton, nor is he simply a conduit for the purpose of passing legal questions on to this Court. When properly called upon he must evaluate the evidence in a case and pronounce whether the plaintiff has made a prima facie case. This he has done. There is a presumption that the judge's appraisal of the evidence was correct. The court had before him much that cannot be brought here. He saw the witnesses and heard them testify. He also had the benefit of much demonstrative evidence. Repeatedly throughout this record, recurs testimony which was apparently accompanied by gestures giving location, direction, height, etc., which wholly escaped recordation. Hence, some things which are obscure to us, may have been clear at the bar.

Certain questions are suggested by this evidence. How

could the position of the assured and of the gun have been so changed while the plaintiff took two or three steps from the door? How could the assured, after being shot in the chest, fall into a position on the flat of his back at full length, without convulsion or movement, with his gun exactly parallel to his side, the butt at his feet and the muzzle at his shoulder? But most of all, how could all this occur while the plaintiff retraced instantly after the shot, her two or three steps from the door? These queries, unanswerable from the record, do not strengthen the plaintiff's case.

This much is certain: We cannot say that the trial judge was clearly wrong. In the case, as it stood at the time the verdict was directed in favor of the defendant, the burden was on the plaintiff to show by evidence, not by so-called "presumptions", that the death of the assured was accidental, and the burden here is upon her likewise to show that the trial judge was clearly wrong in saying that that burden had not been sustained. In these requirements we think she has failed. Accordingly, the judgment of the circuit court of Roane County will be affirmed.

*Affirmed.*

LOVINS, JUDGE, dissenting:

I deferentially dissent from the majority opinion. The controlling principle in this action relates to the presumption of accident as opposed to that of suicide in case of a violent, unexplained death. There is a singular lack of precision and unanimity in the treatment of this rule by the courts of this country. The authorities have variously referred to it as a rebuttable presumption of law, as a presumption of fact, and as a permissible inference. To my mind it is a rebuttable presumption of law arising from the common experience of mankind and from the circumstances usually attending such deaths. *Ryan* v. *Metropolitan Life Ins. Co.*, 206 Minn. 562, 289 N. W. 557.

See 20 Am. Jur., Title Evidence, Section 162; Jones on Evidence Civil Cases, 4th Ed., page 16; 5 Wigmore on Evidence, 2d Ed., Section 2191 et seq.; Burrill on Circumstantial Evidence, pages 11-60. The presumption is accorded recognition by all jurisdictions in the United States, but there is a division of authority as to the effect and character of such presumption.

This Court adheres to the majority rule holding that when death occurs by violent, external and unexplained means, accident is presumed, but when the cause of death is shown the presumption is no longer effective. *Martin* v. *Insurance Co.*, 106 W. Va. 533, 146 S. E. 53, (qualified in *Bank* v. *Insurance Co.*, 121 W. Va. 152, 2 S. E. 2d 256). The case of *McDaniel* v. *Insurance Co.*, 119 W. Va. 650, 195 S. E. 597, states the rule as follows: "While there is a presumption of law against suicide, such presumption is not evidence, and a showing of facts or circumstances which would warrant a jury in finding that death resulted from a suicidal act overcomes such presumption, and requires a finding in the case by a jury or court, independently thereof, upon the evidence produced at the trial". See *Lambert* v. *Insurance Co.*, 123 W. Va. 547, 117 S. E. 2d 628. The holding of this Court is supported by cases from other jurisdictions. *New York Life Ins. Co.* v. *Gamer*, 303 U. S. 161, 58 S. Ct. 500, 82 L. Ed. 726, 114 A. L. R. 1218. In the *Gamer* case, the Court indicated that the evidence presented a question for jury determination. *McMillan* v. *General American Life Ins. Co.*, 194 S. C. 146, 9 S. E. 2d 562; *Gulf Life Ins. Co.* v. *Weathersbee*, 126 Fla. 568, 172 So. 235; *Falkinburg* v. *Inter-State Business Men's Accident Co.*, 132 Neb. 670, 272 N. W. 924; *Stuckum* v. *Metropolitan Life Ins. Co.*, 283 Mich. 297, 277 N. W. 891. This presumption certainly has some function in actions of this character. It is said to be "derived from the common experience of mankind". In the case of *Southland Life Ins. Co.* v. *Brown* (Tex. Civ. App.), 121 S. W. 2d 653, it is held that the presumption against suicide is very strong. In cases of this kind circumstantial

evidence is usually the only kind of evidence available. If direct evidence is adduced showing either accident or suicide the death is explained, and the presumption here under consideration has no place in the consideration of the controversy and affords no assistance in reaching a conclusion. The question naturally arises how much evidence is required to render ineffectual this presumption. Where the evidence relied upon to eliminate the presumption is circumstantial, the circumstances established must exclude every reasonable hypothesis consistent with death from accident. *Goodbar* v. *Life Ins. Co.*, 89 W. Va. 221, 108 S. E. 896; *McDaniel* v. *Metropolitan Life Ins. Co., supra; McMillan* v. *General American Life Ins. Co., supra; Edwards* v. *Business Men's Assurance Co.* (Mo.), 168 S. W. 2d 82.

It is also to be borne in mind that where an insurance policy covers death by accident only, the burden of proving accidental death is on the plaintiff; but where the policy insures against death from any cause except suicide, the burden is on the insurer to prove the exception contained in the policy. *Lambert* v. *Insurance Co., supra; Gray* v. *Metropolitan Life Ins. Co.*, 308 Ill. App. 1, 31 N. E. 2d 85. But the burden so imposed on the insurer does not relieve the plaintiff in an action on an insurance policy from proving facts and circumstances from which accidental death may be inferred.

The presumption of law against suicide hereinabove mentioned is a rebuttable presumption. *Gray* v. *Metropolitan Life Ins. Co., supra.* Such presumption has been so considered by this Court, as well as the courts following the majority rule. So far as I have been able to ascertain there is no holding in this jurisdiction as to the amount of evidence necessary to render the presumption ineffectual. It seems reasonable that where there is no competent evidence to show death by suicide in cases where violent death is unexplained, that the presumption remains in effect and controls the result. *Gulf Life Insurance Co.* v. *Weathersbee, supra.* A *prima facie* case is made upon

the showing of death by violent and external means. *Dimmer* v. *Mutual Life Ins. Co. of N. Y.*, 287 Mich. 168, 283 N. W. 16. Where the issue of fact is suicide or accident and the means of death is not explained, I think that the evidence which destroys the presumption must be such as to exclude every reasonable explanation of death except suicide. Of course, where it is reasonably probable from the evidence that suicide was the cause of death, and reason and common sense leave no room for a different contention, it becomes a matter of law for the court. On the contrary, where the evidence as to suicide is conflicting and purely circumstantial or inconclusive, and, there is a reasonable basis for difference of opinion, the case should be submitted to a jury. Cooley's Briefs on Insurance, 2d Ed., Vol. 6, 5478, 5479; Couch on Insurance, Vol. 6, Section 1262r.

In this case it is not disputed that Robert N. Tower came to his death by violent and external means. The majority opinion holds that the facts tend to show suicide. A careful analysis wholly fails to indicate self-destruction. The position in which a human body is found after a gun shot wound does not with certainty indicate the manner of inflicting the same, nor the existence of intent, such positions being as varied as the occurrences of which they relate.

The science of ballistics gives no accurate rule for calculating the deflection or elevation of a bullet or shot striking bone, wood or other hard substances. The course of the projectile may be changed and, therefore, is an inaccurate indication as circumstantial proof that the firearm was in a certain position when discharged. The course of an unimpeded projectile can be gauged with reasonable accuracy, but where it comes in contact with bone, as here, such course is not a reliable fact from which to draw a controlling inference as to the position in which the gun was held. The fact that the muzzle of the gun was apparently inside Tower's shirt pocket when it was discharged may indicate self-destruction, but that is the

only circumstance from which the inference is drawn in the majority opinion that the gun was intentionally placed therein by Tower just before the fatal shot was fired. A reasonable explanation of this circumstance is that when Tower reached toward his hunting coat, the muzzle of the gun, having a polychoke and a front sight or bead thereon, may have accidentally caught the muzzle in his pocket, which was of the "bellows" type. There is nothing in this record on which a conclusion of suicide may be based other than the conjectural fact just mentioned. I am therefore convinced that the factual premise herein was such as to show death by violent external means; that there is no reasonable explanation of Tower's death other than accident; and that the presumption against suicide remained effective throughout the trial.

Litigants should not be deprived of their constitutional right of trial by jury where the facts are in dispute or on light and transient grounds, especially when such grounds are supported by inconclusive and conjectural facts and circumstances.

The second point of the syllabus of the majority opinion appears to be inappropriate. To me there was no evidence from which the jury could infer that Tower came to his death from a self-inflicted wound, and the facts, as shown by the plaintiff, aided by the presumption of law against suicide, were sufficient to take the case to the jury.

It is also said in the majority opinion that the burden is upon the losing party to show that the trial court had erroneously appraised the evidence in directing a verdict for the successful litigant. It is somewhat difficult for me to understand how the litigant can carry a burden such as is imposed by the majority opinion. A showing generally relates to factual rather than legal matters. A trial court on motion to strike the evidence and direct a verdict considers the facts as a totality giving to the party who has introduced the evidence the benefit of every fact proved, as well as all reasonable inferences to be drawn

therefrom. The action of the trial judge in directing a verdict is based on a legal rather than on a factual concept. Presumably, it is meant that the litigants should advance arguments or call attention to binding precedents. This would not be a showing in any sense. It would be an argumentative development of principles of law in support of the position taken by a party to an action, such principles being logically applicable to the matter then under inquiry.

Relying upon what is shown by the record in this case and without indulgence in speculation as to what was apparent in the trial court and did not appear in the printed record, I am of the opinion that the question of fact here presented, to-wit, whether Tower came to his death by accident or suicide, was a question for jury determination upon the facts which were introduced in evidence, together with such reasonable inferences as the jury was authorized to consider from the facts so proved and the legal presumption against suicide, if such legal presumption remained effective after introducton of defendant's evidence. In my opinion the trial court's action in striking the evidence and directing a verdict was error, and I would reverse the judgment of the Circuit Court of Roane County.

I am authorized to say that Judge Riley joins in this dissent.