18004

Miriam W. COLEMAN, Respondent, v. PALMETTO STATE LIFE
INSURANCE COMPANY, Appellant (two cases)

(128 S. E. (2d) 699)

*Messrs. Roy V. Lind,* of Columbia, and *Suggs & Mc-
Cutcheon,* of Conway, *for Appellant,*

*Ogden A. Rankin, Esq.,* of Conway, *for Respondent,*

December 12, 1962.

Moss, Justice.

Miriam W. Coleman, the respondent herein, as beneficiary under the terms of two accident insurance policies on the life of her son, Jimmy W. Coleman, issued by Palmetto State Life Insurance Company, appellant herein, sued to recover the proceeds payable under the terms of such policies.

The two policies provide for the payment of indemnity for death "caused solely by external, violent and accidental means", but excludes coverage where death results from "self-inflicted injury". It is agreed that the death of the insured was due to a gunshot wound in the head. The complaints alleged accident and thereby negatived self-destruction. The answers denied accident and alleged suicide.

These cases were tried at the January 1961 term of the Civil Court of Horry County before the Honorable C. M. Epps, and a jury, and resulted in verdicts in favor of the respondent. The appellant made a timely motion for a directed verdict on the grounds (1) that the respondent had failed to prove that the death of the insured was accidental, and (2) that the only reasonable inference to be drawn from the evidence was that the insured died as a result of self-inflicted injuries and suicide. After an adverse judgment, the appellant moved for judgment *non obstante veredicto* and, in the alternative, for a new trial, upon the same grounds as were included in the motion for a directed verdict. These motions were refused and this appeal followed. The appeal to this Court from the refusal of the Trial Judge to grant the motion of the appellant for a directed verdict or judgment *non obstante veredicto* presents only the question of whether or not all of the evidence is susceptible of any reasonable hypothesis other than the insured came to his death by suicide.

It is elementary that if the evidence is conflicting, or if different inferences can reasonably be drawn from it, as to how the insured came to his death, it is proper to submit this issue to the jury. *Mandis v. New York Life Ins. Co.,* 177 S. C. 390, 181 S. E. 472, and *McLane v. Reliance Life Ins. Co.,* 192 S. C. 245, 6 S. E. (2d) 13. However, when the only reasonable inference from all of the evidence is that the death of the insured was not by accident but by self-destruction or suicide, then the matter becomes one of law for the Court and there is no issue for submission to the jury, and it is the right and duty of the Judge to direct a verdict. *McMillan v. General American Life Ins. Co.,* 194 S. C. 146, 9 S. E. (2d) 562; *Long v. Metropolitan Life Ins. Co.,* 228 S. C. 498, 90 S. E. (2d) 915; and *Strawhorne v. Atlantic Coast Life Ins. Co.,* 238 S. C. 40, 119 S. E. (2d) 101.

In the *Long case,* this Court said:

"When death by violent injury has occurred, unexplained, the presumption is against suicide; but such presumption is nothing more or less than recognition of the abnormality of suicide. It is not evidence, and therefor does not of itself require submission of the issue to the jury when the only reasonable inference from all of the evidence is that the deceased took his own life. *Cf. McMillan v. General American Life Ins. Co.,* 194 S. C. 146, 9 S. E. (2d) 562, and *Johnson v. Atlantic Coast Line R. Co.,* 217 S. C. 190, 60 S. E. (2d) 226. It must be borne in mind, too, that in the case at bar it was conceded that respondent had paid the face of the policy, and that the issue was as to its liability under the 'double indemnity' provision for accidental death; that therefore the burden was upon appellant to show that the condition precedent to such liability, *i.e.,* death by accident, had occurred; and that although at the outset proof of death by violent injury, without more, may have sufficed to shift to respondent the burden of offering credible evidence to the contrary, nevertheless when such evidence had been

offered the burden of persuasion, as distinguished from the burden of going forward with the evidence, rested upon appellant to bring herself within the double indemnity provision. *Jefferson Standard Life Ins. Co., v. Clemmer,* 4 Cir., 79 F. (2d) 724, 103 A. L. R. 171."

In this case the burden of proof was upon the respond to show the death of the insured by accident. *White v. North Carolina Mut. Life Ins. Co.,* 208 S. C. 168, 37 S. E. (2d) 505; *Goethe v. New York Life Ins. Co.,* 183 S. C. 199, 190 S. E. 451; and *Long v. Metropolitan Life Ins. Co., supra.* The burden of proof was upon the insurer to show that the insured died as a result of suicide or self-destruction. *Sanders v. Commonwealth Life Ins. Co.,* 134 S. C. 435, 132 S. E. 828; and *Swofford et al. v. Life Ins. Co. of Va.,* 159 S. C. 337, 157 S. E. 7.

In *Strawhorne v. Atlantic Coast Life Ins. Co.,* 238 S. C. 40, 119 S. E. (2d) 101, it was said:

"Where the defense of suicide is interposed by the insurer to defeat recovery under a policy of insurance, the burden is upon the insurer to prove the fact of suicide by the preponderance of the evidence. It is true that where death by violent injury has occurred, unexplained, there is a presumption against suicide, but this is a presumption of law and not of fact. When evidence as to the fact of suicide is introduced, the presumption against suicide vanishes and the question must be resolved upon the evidence. *McMillan v. General American Life Insurance Company,* 194 S. C. 146, 9 S. E. (2d) 562."

The insured was seventeen years of age at the time of his death on November 11, 1959. He was a resident of Conway, South Carolina, and was visiting in the home of his grandmother in St. George, South Carolina, where he went on October 6, 1959, and remained until the time of his death. His uncle and aunt, Mr. and Mrs. Charlie Wimberly, resided about one hundred yards from

the home of the insured's grandmother. It appears that the insured had complete access to the home of his uncle and aunt and visited their home in their absence while they were away at work. The uncle owned a 22 caliber revolver which was kept concealed in a dresser drawer in the bedroom of the Wimberly home. The insured had never seen the revolver nor had any knowledge of its existence. Charlie Wimberly and Barbara Wimberly testified that they came home from work at about 5:30 P.M. on the afternoon of November 10, 1959. Upon arrival at their home, Charlie Wimberly entered the front door and his wife went in the back door of their residence. They both testified that when they came home from work they discovered the insured in the living room of their home. He was sitting on the floor with his back against the front of the couch and his head upon the couch. His aunt shook his shoulder, thinking that he was asleep, and while she was attempting to awaken him, the revolver owned by the uncle fell on the floor. The uncle testified that the revolver did not fall from the insured's hands because he could see them and he admitted "It could have fell from the couch because it hit too hard to fall off his lap". Blood stains were upon the couch about thirty inches from where the insured's head was resting upon the couch. The wound in the insured's head was about half way between the eye and ear, entering from the left side. At the time that the insured was found he was unconscious and never regained consciousness. The uncle and aunt and all of the witnesses who viewed the room in which the deceased was found, testified that the furnishings were all in place and had not been disturbed or changed. All of the witnesses concur that there was nothing to indicate that the insured had come to his death by foul play or assassination.

The testimony shows that the injured and unconscious insured was taken immediately, by his uncle, to the office of Dr. Appleby, a physician in St. George, South Carolina. He testified that he examined the insured while he was still in the automobile of the uncle and that he observed a

small wound of entry in his left temple. He found no wound of exit or evidence of any other trauma. He testified that there were no visible powder burns on the area surrounding the wound. Dr. Appleby sent the insured on to the Colleton County Hospital in Walterboro, South Carolina. He was there seen and examined by Dr. Warren Smith. He testified that the insured had a penetrating wound of his head on the left side. He described the wound as being located two centimeters above and one centimeter anterior to the ear. Thereafter, he opened the skull on the right side just opposit the wound on the left side and when the opening on the right side was made, the bullet came out. The physician described the course of the bullet as "penetrating through and through."

A tissue specimen from the wound of entry was sent by Dr. Appleby to the Medical College of South Carolina for examination. The pathologist who examined this tissue testified that he found therein some pigment material which could have been powder or powder material.

The pistol or revolver which caused the death of the insured was admittedly owned by the uncle, Charlie Wimberly. The testimony shows that it was a 22 caliber short revolver, in perfect mechanical condition, and had a load capacity of six bullets. After the injury to the insured, tht pistol was examined and it contained one discharged shell and one which had been snapped by the firing mechanism. There is no testimony as to the type of powder contained in the shells with which the pistol was loaded.

The aunt of the insured testified that the insured was a normal seventeen year old boy and she didn't know of anything that was worrying him. She testified that the insured was right-handed.

There is testimony in the record with reference to the insured's state of mind and his conduct on the day of his injury. Three school children, all of whom were approximately fourteen years of age, testified that they saw the

insured about 2:30 P. M. on the afternoon of his injury; that they stopped the automobile in which they were riding and picked up the insured. He had in his possession his uncle's pistol. After the party had traveled some little distance from the home of the uncle and aunt, the insured pulled this pistol on Jimmy Wheeler. A tussle ensued and, during such, the pistol snapped or misfired. In the words of Jimmy Wheeler, the insured "turned white and didn't look right"; he didn't act like himself but acted "like he was in another world". He had never seen him in that frame of mind. Ada Lou Wheeler testified that the insured "acted rather moody. He acted strange". And that "I had never seen him like that" even though she had known him several years. Joyce Jackson testified that the insured acted "as if he was against everybody." There was other testimony that the insured was picked at by some of the teenagers and he didn't get along with them; that he was disturbed and mixed up.

Mrs. Earl D. Dukes, Jr. testified that she had known the insured for five weeks prior to his death and that they had dated on many occasions. She testified that she talked to the insured by telephone at about 2:30 P. M. on the date of his injury and that the insured told her that " a group of young people had been picking at him and he would get even." She testified also that he told her he had found the gun in his uncle's house. She further testified that the insured called her again at about 4:15 P. M. on the date of his injury and,

"He told me when he called and I answered the phone, he said, 'I have called to tell you goodbye,' and I thought he meant he was going back to Conway, and he said, 'No, I am going to kill myself,' and I said I thought he was picking at me and he said he was going to make it look like an accident so his mother could collect the insurance—he even told me how much—and—I asked him how he was going to do it, and he said he was going to shoot himself with his uncle's gun with his left hand. I tried to talk to him. I didn't know

if he meant it, and he threatened his grandmother's life. He wouldn't listen that time. He always did before."

This witness further testified that during the last few days prior to the death of the insured, he had repeatedly told her that he was going to kill himself but that she thought he was teasing her and was not serious.

The testimony shows that the insured attended Conway High School and was in the ninth grade. He dropped out of school in the middle of April 1959, and had not attended school since then. Prior to quitting school, he was consistently absent a good part of the school year, was failing three out of his five subjects, and was above the normal age for students in the ninth grade. According to the testimony, the insured was unemployed, having been unsuccessful in his effort to join the Coast Guard or to obtain employment at the Ammunition Depot in Charleston, South Carolina. Upon this happening, his uncle went to Charleston on October 6, 1959 and brought the insured to St. George, where he lived until his death.

We think that the only reasonable inference or conclusion that can be drawn from the evidence in this case is that the insured committed suicide. The claim that the death of the insured resulted from an accidental discharge of a pistol is, in our opinion, met by the physical facts which show that the bullet which caused his death entered the skull in the left temple and passed through his head in a direct line from the entrance wound to the right side of his head, showing conclusively that the pistol must have been fired at or near the head of the insured while he was either in a standing or sitting position. In addition, there is the undisputed testimony of his declared intention to take his own life. There is no reasonable explanation of these undisputed facts. It is impossible to conceive how such a wound as was received by the insured could have been inflicted by the accidental discharge of the pistol. These facts exclude any reasonable hypothesis that the death of the insured came about in any manner other than by his own intentional act.

The respondent argues that the claim of suicide is rebutted by the fact that there was no evidence of powder burns on the body of the insured. If we assume that the absence of powder burns shows that the pistol was discharged at some distance from the insured, then we are driven to the assumption that the pistol was fired by some person other than the insured and there is absolutely nothing in this record upon which such an assumption can be based.

The respondent argues that since the testimony shows that the insured was right-handed, and the bullet which caused his death entered from the left side of his head, that such infers an accident. If the insured designedly took his life, he would in the circumstances, naturally seek to create the appearance of an accident. In fact, the testimony shows that when he talked to Mrs. Dukes, by telephone, he told her that he was going to shoot himself with his uncle's gun, using his left hand, so as to make his death "look like an accident, so his mother could collect the insurance."

A review of the entire record in this case does not reveal any facts proving, or tending to prove, directly or indirectly, that the pistol was discharged accidentally. The case of *Tower v. Equitable Life Assur. Soc. of United States,* 125 W. Va. 563, 26 S. E. (2d) 512, was an action on a double indemnity provision of a life policy. It appeared that the insured's death resulted from a gunshot wound and there was evidence to the effect that at the moment the wound was inflicted the gun could not have been discharged except by the insured, and the course of the shot strongly indicated that at such moment the gun barrel was horizontal and at the height of the insured's chest. It was held that a *prima facie* case of suicide had been made out which caused the original presumption of accidental death to disappear. The Court said:

"No counter-balancing facts or circumstances are pointed out which tend to show any accidental manner in which this gun was (not might have been) actually discharged; none accounts for it on the theory of an accident. There is no

showing of any fortuitous happening which could have placed the gun in its established position, or that could have discharged it in that position. The original presumption of accident disappeared upon the *prima faciee* showing of suicide, and no evidence has been produced to fill the void thus created in plaintiff's case. * * *"

■ Verdicts of juries cannot be predicated on surmise or speculation. They must be based upon evidence. There is, in this record, no evidence from which a jury could have reasonably found that the death of the insured resulted from accident. The positive, direct and undisputed evidence can lead to but one reasonable conclusion, that it was suicide. Any theory here but that of suicide would have to rest on pure surmise or speculation. The Trial Judge erred in refusing to grant the motion for a directed verdict in favor of the appellant.

The exceptions of the appellant raised other issues which we find unnecessary to decide in view of the conclusion heretofore reached.

The judgment of the lower Court is reversed and the case remanded for entry of judgment in favor of the appellant under Rule 27.

Reversed.

TAYLOR, C. J., LEWIS and BRAILSFORD, JJ., and LEGGE, Acting J., concur.